THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHN McMULLEN, Defendant-Appellant.

First District (4th Division) No. 78-431

Opinion filed March 27, 1980.

Leo I. Fox, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Wesley H. H. Ching, and Dale F. Weigand, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE JOHNSON delivered the opinion of the court:

Defendant, John McMullen, was charged by indictment with the offenses of attempt murder (Ill. Rev. Stat. 1971, ch. 38, par. 8—4), aggravated assault (Ill. Rev. Stat. 1971, ch. 38, par. 12—2), and armed violence (Ill. Rev. Stat. 1971, ch. 38, par. 33A—2). Prior to trial, defendant McMullen filed a motion to quash his arrest and to suppress evidence. The trial court denied the motions. He was tried by a jury and found guilty of attempt murder, aggravated assault, and armed violence. Judgment was entered on the verdicts and the trial court sentenced him to 3 to 9 years in the Illinois Department of Corrections on the charge of attempt murder. We affirm.

In his appeal to this court, defendant contends (1) the trial court erred in failing to suppress alleged inculpatory admissions he made following an improper detention and interrogation by police officers; (2) his arrest lacked probable cause; (3) the trial court committed reversible error by allowing a police officer to bolster his testimony even though that testimony was never impeached nor was there any charge or implication

of fabrication; and (4) he was denied a fair trial when his defense attorney failed to give a closing argument.

At the pretrial hearing, a motion was heard based upon the allegation that the arresting officers lacked probable cause to arrest defendant. At the same time, the trial court conducted a hearing on a motion to suppress certain identification evidence.

At the hearing, Officer Robert Scarpetti of the Chicago Police Department testified about his first encounter with defendant. On December 28, 1973, he was given a description of an individual who was wanted in connection with shooting at a police officer. The description was of a male, between the ages of 20 and 25 years, 5 feet, 10 inches in height, and weighing 170 pounds. The shooting was reported to have occurred at 1220 South Keeler Avenue, in Chicago.

On the same date at approximately 9:15 p.m., Officer Scarpetti was on patrol in an unmarked car and in plainclothes. He and his partner, Officer Richard Oswald, viewed a man, who later was identified as the defendant, John McMullen, as he stood in front of a building at 1217 South Keeler Avenue, directly across the street from the address of the reported incident. Officer Scarpetti testified defendant matched the description of the individual who shot at the police officer. The patrolman stopped the car and approached defendant who turned and ran into the building. The officers chased defendant to a third floor apartment. They knocked on the door but there was no answer.

The officers returned to their car and drove around the block. When they returned to the building at 1217 South Keeler Avenue, defendant was standing in the doorway. The officers left their car and pursued him. This time he did not run. When the officers were close enough to question defendant, he cursed them and threatened them with bodily harm. Officer Scarpetti testified, quoting defendant as stating: "I missed you yesterday, but I won't miss you this time"; and, "Why didn't you follow me up the stairs yesterday"; and, finally, "I'm going to blow your [f_ _ _] head off."

It was after defendant made these responses that the police officers arrested him. A search of his person failed to yield a weapon.

Defendant McMullen was taken to the police station where he was viewed in a lineup by Officer Gerald DiPasquale. The lineup was properly conducted, and Officer DiPasquale identified defendant as the person who shot at him the day before.

Officer Oswald was called as a witness to corroborate the testimony of Officer Scarpetti.

Officer DiPasquale also testified at the hearing on the motion. He said he was called to view a lineup on December 28, 1973. Officer DiPasquale stated he did not see defendant while he was waiting at the police station.

Six people participated in the lineup and defendant was identified by Officer DiPasquale as the person who shot at him.

Both sides rested and the trial court denied defendant's motions.

The parties proceeded to trial where evidence was presented that shortly before 11 a.m. on December 27, 1973, Officer Gerald DiPasquale was patrolling in his squad car in the vicinity of Keeler Avenue and Roosevelt Road. The officer testified that he stopped his car approximately 75 feet from a bus stop located at the intersection of those streets. Standing at the bus stop were two women and defendant. Officer DiPasquale observed the bus stop until defendant turned and started to walk southbound on Keeler Avenue. The officer followed defendant in his squad car. When defendant noticed he was being followed, he began to run. He ran to an abandoned building located at 1220 South Keeler and entered. Officer DiPasquale got out of his car and pursued him.

It was snowing and there were no lights in the building, but someone could be heard inside running up a flight of stairs. Following the sound, Officer DiPasquale ran into the hallway of the first floor, but due to darkness his vision was limited. As he approached the stairs, he saw defendant with a blue steel handgun. Defendant fired several shots at Officer DiPasquale. The officer returned the gunfire, then quickly radioed for assistance. Minutes later, 60 to 75 policemen, including a canine unit, a heavy van, and a helicopter, responded to the radio call. A search of the building was conducted but no one was found.

When Officer DiPasquale returned to the police station, he gave a description of the man who had shot at him. The description was of a male, approximately 5 feet, 10 inches in height, weighing 170 pounds, between the ages of 20 and 25 years, and wearing dark clothing and a three-quarter-length coat. The officer testified the man who shot at him had a light mustache, but that fact was not reported in his description. Neither did he include the man's hairstyle or facial scar.

On December 28, 1973 at about 6 p.m., Officer Scarpetti learned of the assault upon Officer DiPasquale in a briefing session at the police station. He was given the description of the assailant and went on patrol anticipating someone who would match the description. Officer Scarpetti went on to repeat the testimony he had given during the pretrial hearing.

Defendant's sister, Bertha Hill, was called to testify on his behalf. Mrs. Hill lived at 1217 South Keeler Avenue on the third floor. On December 27, 1973 at approximately 11 a.m., she was awakened by noise which sounded like gunfire. She looked out of her window and saw police cars and policemen surrounding the building across the street. Mrs. Hill called her mother, Mary Lee McMullen, to apprise her of the shooting.

Mrs. McMullen was called to testify on behalf of defendant. On December 27, 1973, defendant was living with her. Mrs. McMullen lived

in a building located 6 blocks from the scene of the shooting incident. Her daughter, Dorothy Cole, lived upstairs. Defendant slept at his parents' home 2 or 3 nights a week; the other nights he resided with his sister, Dorothy Cole. Mrs. McMullen stated she had seen her son at 1 a.m. on December 27 before she went to bed, but she did not see him later that morning.

Calvin Robinson testified that he had seen defendant at the home of Dorothy Cole. When Robinson entered Mrs. Cole's apartment early on the morning of December 27, 1973, defendant was there recording music. Robinson testified defendant had spent the night in Mrs. Cole's apartment and was still sleeping at 4 p.m.

Calvin Robinson's wife, Linda, testified she saw defendant in Mrs. Cole's apartment at 10:30 p.m. on December 26, and again when she arose at approximately 11 a.m. on December 27.

Defendant testified in his own behalf. He stated he was in his sister's apartment recording music until 3 a.m. December 27. He went to sleep on the couch and remained asleep until 9 that evening. According to defendant, on the following day, December 28, at approximately 9 p.m., he walked to the apartment of his sister, Bertha Hill, at 1217 South Keeler Avenue. Across the street was the abandoned building where the shooting incident had occurred. When defendant arrived, he met Bertha Hill outside and accompanied her to the bus stop.

Defendant stated that after his sister boarded the bus, he turned and walked back to 1217 South Keeler. He then saw two police officers in a car who were watching him. Defendant testified he entered the building, went upstairs to the third floor apartment of his sister, and heard what he believed to be police officers coming up the stairs behind him. After he entered the apartment he looked out of the window and saw the police car. He remained in the apartment until he saw the police officers return to their car. After a short time, defendant went back outside the building. It was then that police officers Scarpetti and Oswald returned, questioned defendant, and searched him. The policemen told defendant that if he was still standing in front of the building in 15 minutes he would be arrested. Defendant returned to his sister's apartment. Later, when defendant left his sister's apartment, Officers Scarpetti and Oswald approached him and ordered him to halt. He was arrested for disorderly conduct and taken to the police station.

At the station, defendant was placed in a lineup along with five other individuals. Officer DiPasquale identified defendant as the person who shot at him.

At the conclusion of the trial, the jury returned verdicts of guilty of attempt murder, aggravated assault, and armed violence. Defendant was sentenced based upon the charge of attempt murder.

Defendant contends the trial court erred in failing to suppress inculpatory admissions he made following his detention and interrogation by the police officers. Defendant argues the "stop" failed to meet the standards set forth by the United States Supreme Court in *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868. Those standards are codified in section 107—14 of the Code of Criminal Procedure (Ill. Rev. Stat. 1971, ch. 38, par. 107—14). The section provides in pertinent part:

"A peace officer, after having identified himself as a peace officer, may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense as defined in Section 102—15 of this Code, and may demand the name and address of the person and an explanation of his actions."

■■ The purpose of this standard is to protect individuals from intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches. (*Terry*, 392 U.S. 1, 22, 20 L. Ed. 2d 889, 906, 88 S. Ct. 1868, 1880.) In justifying the particular intrusion, the police officer must be able to point to specific and articulable facts which taken together with rational inferences from those facts reasonably warrant that intrusion. *Terry*, 392 U.S. 1, 21, 20 L. Ed. 2d 889, 906, 88 S. Ct. 1868, 1880.

■ This issue turns on the circumstances of the detention and interrogation of defendant. We find the police officers did have articulable facts at hand and made rational inferences from those facts. Officers Scarpetti and Oswald testified that on the evening of December 28, 1973, they were patrolling when they saw defendant standing in the doorway of a building. Upon their approach, defendant turned and ran through the doorway and up three flight of stairs. When the officers could not find him in the building, they returned to their car and drove around the block. The officers had already been given the description of a man who had shot at a police officer the previous day. Officer Scarpetti testified the defendant matched that description. As well, the shooting had occurred across the street from where defendant was originally sighted.

■ In this case the detention and interrogation of defendant, unlike an arrest, did not require probable cause (see *Adams v. Williams* (1972), 407 U.S. 143, 148-49, 32 L. Ed. 2d 612, 618, 92 S. Ct. 1921, 1924-25; *People v. Ussery* (1974), 24 Ill. App. 3d 864, 868, 321 N.E.2d 718, 721) and was properly made by the police officers.

Defendant contends his running from the police and the fact that he matched the general description of the assailant did not justify the officers' stopping and questioning him. Defendant cites *People v. Moorhead* (1974), 17 Ill. App. 3d 521, 308 N.E.2d 381, to support his position. In

*Moorhead*, the defendant was stopped by police who found narcotic drugs in his possession. Defendant sought to suppress physical evidence, alleging he had been searched and his property seized without warrant or authority. We agree with the State that the facts in *Moorhead* are distinguishable from those in this case. In *Moorhead*, the record did not reveal any basis for the "general description" used by the apprehending police officer. As well, the court noted the remoteness of time and place of defendant's seizure. *Moorhead*, 17 Ill. App. 3d 521, 528.

In the case before us, defendant not only fit the given description but, also, the confrontation between police and defendant occurred across the street from the building where a shooting took place the day before. During that confrontation, defendant made statements alluding to a shooting that occurred a day earlier. Defendant's act of running when he saw the police gives more support to the State's position and further distinguishes this case from defendant's authority.

Defendant offers a supplemental argument, suggesting that evidence of the inculpatory statements should have been suppressed because the arrest was made without probable cause or warrant. This court, in finding the detention and interrogation of defendant lawful, also concludes the police officers had probable cause to make an arrest. The requirements of a warrantless arrest were outlined by this court in *People v. Garza* (1976), 44 Ill. App. 3d 30, 34, 357 N.E.2d 1264, 1268. At that time, we stated:

> "An arrest may be made without a warrant if a criminal offense has been committed and the arresting officer has reasonable grounds to believe that the person to be arrested has committed the offense. [Citation.] The test for the reasonable basis of the officer's belief is whether a reasonable and prudent man in the officer's position and in the possession of his knowledge would believe that the person arrested was guilty of the offense. [Citation.] The officer's belief may be founded on factual and practical considerations of everyday life upon which reasonable and cautious men, not legal technicians, act. [Citation.] A factor that may be considered in judging the reasonableness of the officer's conduct is his responsibility to prevent crime and apprehend criminals. [Citation.] Probable cause for an arrest means something less than evidence needed for a conviction [citation], and the question as to what information is sufficient to establish probable cause is dependent upon the facts and circumstances of each particular case."

The arrest of defendant McMullen was proper under the particular circumstances of this case. It was reasonable for the officers to infer the defendant had committed the shooting a day earlier, due to their

knowledge and the words and actions of defendant. The record supports a finding of probable cause for the arrest, and we find the detention and interrogation of defendant to have been lawful. The motions to quash the arrest and to suppress ensuing statements were properly denied.

Defendant asserts the trial court committed reversible error by permitting Officer Scarpetti to read a portion of his police report into evidence, even though the officer was never impeached on the evidence nor was there any charge or implication of recent fabrication.

At trial, Officer Scarpetti testified that when he and Officer Oswald approached defendant, the following statements were made by defendant:

> " 'None of your [f_ _ _] business. I missed you yesterday, but I won't miss you this time.' 'Why didn't you follow me up the stairs yesterday?' 'I'm going to blow your [f_ _ _] head off.' "

On cross-examination, the defense counsel attempted to impeach the officer's testimony by showing that neither the officer's police report nor the supplementary report contained the statement, "Why didn't you follow me up the stairs yesterday?" On redirect examination, the State elicited from the officer the statement contained in his police report which read:

> "Above person arrested for assault on Officer Robert Scarpetti * * * he threatened to shoot officer's head off and he wouldn't miss this time like he did yesterday."

It was this reading which gave rise to defendant's objection that the officer had been allowed to bolster his testimony. In our opinion, the reading of the report was necessary to explain that the omitted statement was not essential to the officer's testimony.

■■ ■ The explanation or qualification of an impeaching statement to show the statement to be taken out of context or so isolated as to be misleading is proper to avoid unfairness. (See *People v. McConnell* (1977), 48 Ill. App. 3d 355, 363, 362 N.E.2d 1280, 1287.) We find the reading of the police report was not error sufficient to warrant reversal.

■■ ■ Finally, defendant claims that a fair trial was denied him by failure of defense counsel to give a closing argument. This court is not persuaded by defendant's suggestion that failure of counsel to give a closing argument was sufficiently prejudicial to merit reversal. This court is only inclined to reverse a judgment where:

> " '[T]he representation [of counsel] is of such a low caliber as to amount to no representation at all or reduces the court proceedings to a farce or sham.' " *People v. Murphy* (1978), 72 Ill. 2d 421, 436, 381 N.E.2d 677, 685.

Defendant fails to show the lack of a closing argument was any more than a lost opportunity to reiterate his case, and he fails to demonstrate

1050

that the decision by defense counsel was other than an exercise of professional judgment. Without more, we cannot find error on the part of the trial court.

For the aforesaid reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

JIGANTI and ROMITI, JJ., concur.