THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee *v.* JAIME MARTINEZ *et al.*, Defendants-Appellants.

First District (5th Division) Nos. 82—1343, 82—1401 cons.

Opinion filed August 17, 1984.—Supplemental opinion filed on denial of rehearing December 28, 1984.

148

Geary W. Kull, of Chicago (Kathleen M. Pantle, of counsel), for appellants.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and Kevin Sweeney, Assistant States Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, both defendants Jaime Martinez (Martinez) and Kenneth Hernandez (Hernandez) were found guilty of armed robbery (Ill. Rev. Stat. 1979, ch. 38, par. 18—2). Martinez was sentenced to nine years in the Illinois Department of Corrections; Hernandez was sentenced to eight years. They filed separate appeals, which were consolidated.

On appeal, they contend that (1) the trial court erred in denying their motion to suppress the identification testimony of the victim, Ronald Grzesiak; (2) they were not proved guilty beyond a reasonable doubt of armed robbery, as the evidence was insufficient to sustain a conviction; and (3) the trial court erred in failing to grant their post-trial motions based on their alleged newly discovered evidence.

We affirm their convictions for the reasons set forth below.

The facts adduced at the pretrial hearing on defendants' motions to (1) quash their arrest and suppress the evidence found therefrom, and (2) suppress the victim's identification testimony, follow.

The following pertinent evidence was adduced at the hearing on the motion to quash their arrests and suppress evidence found therefrom. Chicago police tactical officer Michael Daliege received a radio call of a robbery in progress from the police radio dispatcher on December 29, 1979, at approximately 11:45 p.m. He and his partner, Officer Jerry Makowski, proceeded in an unmarked police vehicle to the 2100 block of West 21st Street, Chicago, where they found the victim, Ronald Grzesiak, in a squad car being interviewed by beat officer Nick Matozzi. Matozzi described the alleged assailants as three male Latins wearing dark clothing (two wearing black jackets and one wearing a blue jacket). They were running south on Leavitt Street. Matozzi received this description from the victim.

Officers Daliege and Makowski immediately drove south on Leavitt and within 5 to 10 minutes of the robbery spotted a vehicle in the alley behind 2139 South Leavitt. Daliege testified that they observed a car carrying three Latino men coming towards them in the alley at a very slow rate of speed; the car did not have its headlights on, but was only 30 feet away from the alley exit to the street. A lamp post located five feet away from their vehicle provided sufficient lighting for this portion of the alley.

When they drove their car into the alley, using its headlights for further illumination, they observed guns being thrown out of both the

driver's and front seat passenger's windows into the alley. Daliege later identified defendant Hernandez as the driver of the vehicle, Chano Villalobos[1] as the front seat passenger and defendant Martinez as the back seat passenger. Daliege then approached the vehicle with his gun drawn and requested the three men to step out of the car with their hands visible. The three complied, and he conducted a cursory pat-down on them. Daliege testified that he was aware at the time that a handgun had been involved in the robbery. Two of the men were wearing black jackets and the third wore a blue jacket.

He placed defendants Hernandez and Villalobos under arrest for unlawful use of a weapon, and then radioed Officer Matozzi to bring the victim to the mouth of the alley, as the descriptions of these suspects matched those of the offenders who had been involved in the armed robbery minutes before.

Less than two minutes later, the victim and Officer Matozzi arrived at the alley. The victim identified the three men as the perpetrators of the armed robbery. In addition to the unlawful use of a weapon charge against Hernandez and Villalobos, Daliege filed charges against all three for armed robbery. A post-arrest search of Martinez produced $65 in U.S. currency.

On re-cross-examination Daliege admitted that he had erred in his prior grand jury testimony where he stated that he had received the robbery suspects' descriptions over his police radio. In addition, when asked why he and his partner had not waited for a more complete description of the robbery suspects from Officer Matozzi, Officer Daliege explained that they were aware that the robbery had taken place minutes before their arrival, and that they proceeded in the direction that the suspects were running in, with hopes of finding these men.

Ronald Grzesiak (the victim) testified that he worked for Connie's Pizza on the evening of December 29, 1979. At approximately 11:45 p.m., he and his son were attempting to deliver a pizza to 2136 West 21st Street. His son left the van to deliver a pizza to that address,[2] and he remained alone in the van. The area surrounding the van was brightly lit by vapor-type streetlights and the van's inside overhead dome light was on.

---

[1]Villalobos was later severed from the instant case.

[2]Grzesiak would later testify at trial that his son's initial attempt to deliver the pizza to this address was unsuccessful, as no one answered his knock on the door. Grzesiak contacted Connie's Pizza by radio, requesting that they telephone the occupants of the house to answer the door. His son's second try at delivery was successful.

He had been alone in the van for only a few minutes when an armed Latino man, 5'8" to 5'9" in height, 170 to 180 pounds in weight, wearing a black jacket, with black hair and mustache, approached the driver's side of the van and pointed a handgun directly at his face. He had about one minute to view this man. He next saw a second Latino male on the passenger side of the vehicle. This man, also armed with a handgun, but wearing a blue jacket, inserted the upper portion of his body inside the van's cab through an open window, and he too pointed a gun at the victim. He described the second man as 5'8" to 5'9" in height, 170 to 180 pounds in weight, with black hair and a black mustache. He had the opportunity to view this man for approximately 30 seconds. Finally, Grzesiak described the third Latino man, who was visible to him through his side-view mirror for approximately 15-20 seconds, but who had remained at the rear of the van: 5'4" to 5'5" in height, stocky build, black hair, and black jacket. Further, Grzesiak testified that (1) he had never seen any of these men before, and (2) he was calm during the entire incident, although he admitted that he was in fear of his life.

After taking all of his receipts at gunpoint, the three men fled on foot to the corner of 21st Street and Leavitt Street, a distance of 100 to 125 feet. He did not follow them. Instead, he described the three men to the police, who had arrived at the scene of the robbery in their marked squad car.

A description of the suspects was put out over the radio. After Grzesiak and the officers left the scene to drive through the surrounding area hoping to spot the fleeing suspects, they received a radio message that police had stopped a car containing three males in the alley behind Leavitt Street located between 21st Street and 21st Place, and which requested that Grzesiak be sent to identify these men. They arrived at the alley, and Grzesiak observed the police patting down three men who were up against a green Vega with their backs to him. When they turned around to face him, he was able to positively identify them as the men who had robbed him. Later at the police station, he was asked again to identify each suspect and the individual parts they played in the robbery. A plainclothes officer brought Grzesiak up to the window of the lockup. The three suspects were the only ones in the lockup. Each of the suspects was directed to come forward for identification, whereupon Grzesiak identified them and described their roles in the robbery. This entire procedure occurred less than 45 minutes after the robbery.

The trial court heard arguments by both sides on defendants' motions, and (1) denied their motion to quash the arrest and suppress

the evidence found therefrom; (2) denied their motion to suppress the victim's identification testimony as to the in-alley identification, and (3) granted defendants' motion to suppress the police station identification as to the prosecutor's case-in-chief.

At trial, Grzesiak made an in-court identification of defendant Hernandez as the armed man who had approached the van on its passenger side. He also identified a chrome-colored handgun as that gun which was used by Hernandez in the robbery, and a blue-colored handgun as that which was used by Villalobos during the robbery. He testified that he had occasion to view Hernandez for approximately one minute while Hernandez unsuccessfully attempted to pull the key out of the ignition of the van and the microphone off the radio located in the van.

After giving approximately $65 to the armed man on the driver's side of the van (whose name Grzesiak later came to learn as Chano Villalobos), he saw defendant Martinez through his side-view mirror for approximately 20 seconds. Positioned at the rear of the van, Martinez was "looking around in all directions." Grzesiak made a positive in-court identification of Martinez.

He watched the three men flee south on Leavitt Street and then summoned help by calling the dispatcher at Connie's Pizza. A marked squad car arrived at the scene less than five minutes later. He further testified that while he was giving a description of the suspects to the uniformed car, a plainclothes police unit pulled up alongside them, to which he gave the same description—three Latinos approximately 5'5" to 5'8" tall, all weighing between 170 and 180 pounds, and wearing dark clothing. After the plainclothes unit left, he got into the squad car with the uniformed officers to scout the area. In response to a call over the police radio, they proceeded to a half-block south on Leavitt between 21st Street and 21st Place, where he observed the unmarked car parked at the mouth of the alley, saw three people in another car also in the alley whom he recognized, and saw two objects flying out of the car. From a distance of only eight to 10 feet away, Grzesiak identified these three men as they exited their car as the men who had robbed him. He saw the police frisk and handcuff the men before he returned to the squad car. The alley had good lighting.

On cross-examination Grzesiak testified that he did not recall that he had previously testified at the pretrial suppression hearing that he had viewed the man on the passenger side of the van for 30 seconds; that he said it had been 10 to 15 minutes from the robbery to his in-alley identification, instead of the six- to seven-minute estimation that he now gave; and that he had previously testified that when he ar-

rived at the alley he assumed the men who had robbed him had been found.

Officer Nick Matozzi testified that he and his partner followed the unmarked police car to Leavitt Street, after broadcasting a detailed description of the suspects over the air. When they and Grzesiak arrived at the mouth of the alley only two feet behind the unmarked car, they saw objects coming out of the windows of the suspects' car. After he heard Grzesiak identify the man as the offenders, he assisted one of the plainclothes officers with a pat-down search of the driver of the vehicle (Hernandez). He further identified the handguns which had been previously identified by the victim to be those which he had assisted in retrieving in the alley. On cross-examination, he testified that his marked squad car was driving up to the mouth of the alley as the plainclothes officers were exiting their vehicle. In addition, he testified that the victim had reported a loss of $60 to him right after the robbery.

Chicago police tactical officer Jerry Makowski, one of the arresting plainclothes officers, testified that he was Officer Daliege's partner; that he observed two handguns being thrown from the driver's and front passenger's windows of the suspects' car; that defendant Hernandez, the driver of the vehicle, and defendant Martinez, the sole back seat passenger, both fit the description given by the victim; that the alley was illuminated by the unmarked car's headlights and spotlight, as well as a streetlight located at the mouth of the alley; and that he had used his portable radio to call for the beat car to come to the alley as he and Daliege approached the suspects' blue Vega. He further testified that during a pat-down of the three suspects, he observed the victim standing in the alley six to 10 feet from the suspects' car; that while in the alley, the victim positively identified the suspects as the men who had robbed him; that Matozzi assisted him in the pat-down and arrest of these men while his partner retrieved the weapons; and that he found $60 in the possession of defendant Martinez. Subsequently, Makowski advised the defendants of their constitutional rights; he also later inventoried the two loaded handguns and currency at the police station. On cross-examination, he testified that Grzesiak had been standing next to the squad car as he and Daliege arrived at the scene of the robbery, approximately five minutes after it happened; that Daliege had never used their radio equipment to summon the beat car; that the suspects were not under arrest when they called for Grzesiak to come to the alley; and that the unmarked car had pulled into the alley, without first driving past it.

Officer Michael Daliege, the State's final witness, essentially cor-

roborated the testimony of both Officer Makowski and Officer Matozzi regarding the suspects' arrests. He further testified that prior to their being inventoried, he had initialled the handguns found in the alley; he also identified the handguns in open court. On cross-examination, he testified that he had actually driven the unmarked car past the alley, but had then backed the car up so that he could pull it into the alley; he also admitted that when he first saw the three occupants of the car, he was not sure whether they were all male and/or all Latino. He further testified that the suspects' car continued to travel an additional 10 to 15 feet down the alley even though the unmarked car blocked its exit; that he did not retrieve the guns until his partners completed a pat-down of the suspects; and that Matozzi and Grzesiak arrived at the alley seconds after they had stopped the suspects' car. The prosecution rested following the admission of the handguns into evidence. Defendants' motions for a directed verdict were denied.

Defendant Martinez did not present a defense at trial. Defendant Hernandez presented an alibi defense which was supported by his own testimony and that of his two cousins, Delores Contreras and Manuel Reyas.

Delores Contreras, 16 years old at the time of trial, testified that Hernandez came to her home at 2137 West 21st Street at approximately 9 p.m. on December 29, 1979. She conversed with Hernandez in the kitchen of her home until 10:30 p.m., when her brother, Manuel Reyas, returned home with food for the three of them; she was unsure of the time as there was no clock in her kitchen. She further testified that sometime thereafter, when Hernandez was leaving her home, she noticed the reflection of flashing blue lights on the ceiling of her living room. Standing on a couch in order to be able to see through a window, she observed two "squad" cars and a pizza truck in the street in front of her residence, but admitted that she had never gone to the police with this information.

Manuel Reyas testified that he lived with his sister Delores Contreras; that after eating the food that he had brought in at approximately 10:30 p.m., he and Hernandez watched a movie until about midnight; and that when he walked outside with Hernandez he saw a pizza truck and a "couple of squad cars."

He admitted that Hernandez was actually his cousin, but he considered Jaime Martinez closer to him, and that he had met one of Hernandez' friends, Chano Villalobos, a few times. He knew Hernandez, Martinez and Villalobos to be friends. He saw no lights flashing on the ceiling of his living room, and both police cars that he observed in front of his home were blue and white in color.

Ken Hernandez, on his own behalf, testified that in December 1979 he was employed at Vulcan Materials, making $7.50 per hour, and that on December 29, 1979, his car was not working and Chano Villalobos had come to his home to pick him up. He drove Villalobos back to his home, and left to do his laundry and grocery shopping. At Villalobos' request, he returned Villalobos' car to his cousin Manuel Reyas' home. His cousins Juan and Delores Contreras were home when he arrived at approximately 9 p.m. He left his aunt's home later that night when Villalobos never appeared. He parked the car directly in front of his aunt's home, but when he left the house, he found that the street was blocked by two squad cars and a pizza truck. He waited for one squad to move so that he could get out of the parking space and then proceeded right on Hoyne Avenue, where he picked up Villalobos and Martinez, who were on foot. Villalobos got into the front passenger seat and Martinez got into the back seat; one of the men had to urinate so they turned into the alley behind his aunt's home. Hernandez turned the headlights of the car off to provide the man with privacy. He testified that he dropped his chrome-colored handgun, which he carried for his own protection, out of the car's window when he saw the police car at the end of the alley. He further testified that the police ordered them out of the car before it had stopped; that after the police searched them, one of the officers then went back to his vehicle to radio another unit; and that a few minutes later a squad car pulled up behind the police car which had initially stopped them.

At the close of their case, the trial court denied their motion for a directed verdict. The jury found both defendants guilty of the offense of armed robbery.

Subsequent to their convictions, defendant Martinez made a motion to vacate judgment and moved for a new trial based upon Hernandez' previously made motion for a new trial and his petition to vacate judgment. Hernandez' motions were based on an affidavit allegedly made by Beatrice Villalobos, who averred that subsequent to Hernandez' conviction she engaged in a conversation with Juan Contreras (Hernandez' cousin) on March 27, 1982, wherein he admitted to her that he, not Ken Hernandez, was involved in the December 29, 1979, robbery of the Connie's Pizza van. Photographs purporting to show a physical resemblance between Hernandez and Contreras were attached as exhibits to Hernandez' petition. Hernandez additionally requested that the authorities issue an arrest warrant for Contreras, and that they conduct a lineup upon his apprehension. The trial court denied both defendants' post-trial motions for a new trial and the va-

cation of their judgments. Following arguments concerning both mitigation and aggravation, the trial court sentenced Hernandez to nine years in the Illinois Department of Corrections; Martinez received an eight-year sentence. The defendants thereafter appealed.

OPINION

Defendants first contend that the trial court erred by not suppressing the identification testimony of the victim because (1) the identification flowed directly from an illegal stop and detention; (2) the defendants were denied due process of law when the trial court allowed such unnecessarily suggestive identification procedures to be used; and (3) the victim's in-court identification had no independent origin. .

We turn first to address defendants' assertions that the victim's identification resulted from an illegal arrest and detention. Defendants initially argue that they were doing nothing illegal at the time of the stop, as they were merely driving slowly through an alley at night, an activity, they contend, which is an insufficient basis for a stop. They argue that driving slowly does not violate the law unless the reduced speed impedes or blocks other traffic.

Conversely, the State maintains that the initial stop of defendants' car was a valid investigatory stop because the car was being driven without lights in an area to which the suspects had fled.

 ▌ It is well settled that a police officer may stop and temporarily detain an individual for the purpose of a limited investigation absent probable cause to arrest him if the officer is able to point to specific and articulable facts which, taken together with reasonable inferences drawn from the officer's experience, would reasonably warrant the investigative intrusion. (*Terry v. Ohio* (1968), 392 U.S. 1, 20-21, 20 L. Ed. 2d 889, 905, 88 S. Ct. 1868, 1879-80; *People v. Beil* (1982), 110 Ill. App. 3d 291, 293, 442 N.E.2d 291, *cert. denied* (1983), __ U.S. __, 78 L. Ed. 2d 100, 104 S. Ct. 93; *People v. McMullen* (1980), 82 Ill. App. 3d 1042, 1047, 403 N.E.2d 539.) " 'Reasonable' in this context also means that the facts and circumstances must be specific and articulable." (*People v. McGowan* (1977), 69 Ill. 2d 73, 78, 370 N.E.2d 537, *cert. denied* (1978), 435 U.S. 975, 56 L. Ed. 2d 69, 98 S. Ct. 1624.) The court in *Terry* decided that an objective standard is to be used in determining whether a stop is reasonable, namely, whether the facts available to the officer warrant a man of reasonable caution to believe that the action taken was appropriate. (*Terry v. Ohio* (1968), 392 U.S. 1, 21-22, 20 L. Ed. 2d 889, 906, 88 S. Ct. 1868, 1880; accord, *People v. Holdman* (1978), 73 Ill. 2d 213, 221, 383

N.E.2d 155, *cert. denied* (1979), 440 U.S. 938, 59 L. Ed. 2d 496, 99 S. Ct. 1285.) However, a mere suspicion or a hunch is not sufficient. *People v. Gunderson* (1978), 66 Ill. App. 3d 516, 522, 383 N.E.2d 1296.

■ Illinois has codified the holding in *Terry* with section 107—14 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1979, ch. 38, par. 107—14) to provide that a police officer, after having identified himself as such, may lawfully stop any person in a public place for a reasonable period of time when he reasonably infers from all the circumstances that the individual is about to commit or has committed an offense.

■ Applying the above principles to the case at bar to determine whether the stop, if any, of the suspects' car in the alley was proper under *Terry*, we must focus on the knowledge possessed by tactical officer Daliege pertaining to all the circumstances surrounding the armed robbery. According to Officer Daliege's testimony at the pretrial hearing on defendants' motions to quash their arrests and suppress the victim's identification testimony, he was aware that the victim had described his assailants as "three male Latins wearing dark clothing (two wearing black jackets and one wearing a blue jacket) running southbound on Leavitt Street." In their pursuit of these suspects soon after the robbery, Officers Daliege and Makowski encountered a car carrying three male Latins, driving very slowly down an alley, without its headlights on, less than two blocks from the scene of the crime. Given the fact that this car was being driven in violation of section 12—201(b) of the Illinois Vehicle Code (Ill. Rev. Stat. 1979, ch. 95½, par. 12—201(b)), which provides for use of two lighted driving lamps from sunset to sunrise, and in addition to other circumstances surrounding this stop, we believe that the facts known to Officer Daliege prior to the stop of the subject vehicle warranted a man of reasonable caution to believe that the three men inside the car could have committed the robbery, and we conclude that the stop was appropriate. "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." (*Adams v. Williams* (1972), 407 U.S. 143, 146, 32 L. Ed. 2d 612, 617, 92 S. Ct. 1921, 1923, citing *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 889, 88 S. Ct. 1868.) Because our society is so heavily dependent upon the automobile for transportation, we do not find it unreasonable for Officers Daliege and Makowski to have inferred that the suspects would attempt to escape from the general vicinity of the crime in a car. See *People v. Drummer* (1980), 81 Ill. App. 3d 626, 629, 402 N.E.2d 307.

■ Further, in the present case, Officer Daliege has testified that prior to the suspects' car stopping in the alley, he and his partner observed handguns being thrown out of the vehicle's driver's and front-passenger windows. It was therefore not necessary that the officers concern themselves with whether they could make a proper *Terry* stop, as they now had probable cause to arrest the occupants of the auto. We note that two or more occupants of a vehicle may exercise joint possession and control over a handgun. *Cf. People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733 (where probable cause was found to arrest all occupants of a car for unlawful use of a weapon).

■■ ■ Probable cause exists " 'when the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested has committed the offense'." (*People v. Creach* (1980), 79 Ill. 2d 96, 101, 402 N.E.2d 228, *cert. denied* (1980), 449 U.S. 1010, 66 L. Ed. 2d 467, 101 S. Ct. 564, quoting *People v. Robinson* (1976), 62 Ill. 2d 273, 276, 342 N.E.2d 356.) Although a general description of the suspect is not enough for probable cause (*People v. Lumpp* (1983), 113 Ill. App. 3d 694, 447 N.E.2d 963), the observance of the commission of the offense meets the probable cause standard. (See *People v. Watkins* (1981), 98 Ill. App. 3d 889, 897, 424 N.E.2d 701.) Moreover, once a valid lawful arrest is made, a search incident to the arrest requires no additional justification. *United States v. Robinson* (1973), 414 U.S. 218, 236, 38 L. Ed. 2d 427, 441, 94 S. Ct. 467, 477.

■ In the instant case, both defendants argue that the victim's identification of them flowed directly from an illegal arrest. A determination as to whether or not probable cause for an arrest exists in a particular case depends upon the "totality of the facts and circumstances known to the officers when the arrest was made." (*People v. Clay* (1973), 55 Ill. 2d 501, 504, 304 N.E.2d 280.) Furthermore, we note that police officers are often required to act upon a quick appraisal of the data before them in making a probable cause analysis. *People v. Robinson* (1976), 62 Ill. 2d 273, 277, 342 N.E.2d 356.

■ We initially find the arrest of defendant Hernandez, who Officer Daliege testified was seated in the driver's seat of the vehicle, was proper, given the totality of the circumstances known to Officer Daliege at the time of arrest. He testified that he had seen Hernandez toss a handgun out of the driver's window of the vehicle, constituting a direct violation of section 24—1(a)(4) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 24—1(a)(4)), which makes it illegal to transport a handgun in a vehicle. This violation constituted sufficient

probable cause to arrest Hernandez for unlawful use of a weapon.

We turn now to consider defendant Martinez' contention that the police had no probable cause to stop and detain him until the victim could be brought to make a possible identification. Martinez relies heavily upon the decision of *In re Woods* (1974), 20 Ill. App. 3d 641, 314 N.E.2d 606, where the appellate court concluded that the general description given to police by the complainant, uncorroborated by any other relevant facts, was insufficient to justify either a *Terry*-like stop, or the arrest of the respondent. We distinguish the instant case from *Woods* because we believe Officer Daliege could reasonably have inferred from all the circumstances that Martinez was about to commit or had committed the offense, making the temporary detention of Martinez, as well as that of Hernandez, entirely proper under *Terry v. Ohio* for the reasons discussed above.

Next, defendants contend that they were denied due process when the trial court erred by denying their motions to suppress, as the police identification procedures used were unnecessarily suggestive and conducive to irreparable mistaken identification. They argue that the victim's initial identification of both Hernandez and Martinez in the alley was inherently suggestive because the victim testified that he identified the suspects as they had their backs to the victim while in a standard frisk position. Finally, they argue that the police procedures in both the in-alley identification as well as the suppressed lock-up identification used in the instant case insured that the victim would most certainly identify the defendants and Villalobos as the armed robbers.

The State maintains that all three identifications made by the victim were proper, but that the only identification which mattered was that made in the alley about a block from the scene of the armed robbery and within 10 minutes of the offense. We agree. Such procedures are justified in certain circumstances. While it is true that elements of suggestiveness are inherent in any show-up identification procedure, Illinois law clearly provides that one-on-one show-ups are permissible where the witness had an excellent opportunity to observe the defendants during the commission of the crime and where prompt identification was necessary for the police to determine whether or not to continue their search. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) This prompt identification procedure insures accuracy by fostering the desirable objectives of fresh, accurate identification, which may facilitate the immediate release of an innocent suspect as well as enabling the police to resume their search for the fleeing of-

fender. *People v. McKinley* (1977), 69 Ill. 2d 145, 153, 370 N.E.2d 1040, *cert. denied* (1978), 435 U.S. 975, 56 L. Ed. 2d 69, 98 S. Ct. 1623.

The defendant has the burden of showing that the confrontation conducted was unduly suggestive and conducive to an irreparably mistaken identification. (*People v. Kirk* (1979), 76 Ill. App. 3d 459, 469, 394 N.E.2d 1212, *cert. denied* (1980), 447 U.S. 925, 65 L. Ed. 2d 1118, 100 S. Ct. 3019.) In making the determination as to whether a pretrial confrontation is unnecessarily suggestive, the courts must look to a totality of circumstances surrounding it. See *People v. Hamilton* (1977), 54 Ill. App. 3d 215, 218, 369 N.E.2d 377.

The reliability of the out-of-court identification must be considered, and if it overcomes the suggestiveness of the procedures used, the testimony concerning the out-of-court identification may be admitted. The factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminals at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. See *Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243; *Neil v. Biggers* (1972), 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375.

Applying the *Manson-Biggers* factors to the instant case, we agree with the trial court's pretrial determination that the identification of the defendants by the victim in the alley was reliable. The victim had an opportunity to observe both defendants, each for more than at least 20 to 30 seconds, during the armed robbery in a well-lighted atmosphere, wherein only the three suspects were present with the victim. The accuracy of the victim's description of the men was bolstered when the three Latino men were found in the vehicle driving through the alley, two wearing black jackets and one wearing a blue jacket. Only a short time elapsed between the crime and the in-alley confrontation. Testimony at the pre-trial hearing indicated that the victim arrived in the alley to identify the suspects between six and 10 minutes after the robbery. Moreover, the victim demonstrated a high level of certainty in his immediate on-the-scene identification of the defendants.

Upon application of these above factors, we agree with the trial court that the out-of-court, in-alley identification by the victim, of the defendants, was reliable and therefore admissible.

Since we have determined the in-alley identification reliable, we

need not reach defendants' third contention regarding the inability of the State to show that the victim's in-court identification had an origin independent of the out-of-court confrontation. However, the same reliability considerations would lead us, of course, to conclude that the victim's in-court identifications rested upon independent origins sufficient to show separate reliability.

Defendants next contend that they were not proved guilty beyond a reasonable doubt of the armed robbery of Ronald Grzesiak. Defendant Martinez argues that because the victim's viewing of the third man involved in the armed robbery was so limited in time, made under unusual and frightening circumstances and based on a suggestive identification, the affirmance of his conviction would be a "gross miscarriage of justice." In addition, defendant Hernandez asserts that the victim's identification that he was the armed man who came alongside the van's passenger-side was doubtful, and that many discrepancies exist in the victim's testimony regarding his arrival at the scene of his arrest. Hernandez urges this court to recognize the victim's testimony as fabricated. He further argues that this alleged fabrication by the sole eyewitness, coupled with the victim's fleeting opportunity to observe and the suggestive circumstances surrounding the in-alley show-up, all should lead this court to conclude that he was not proved guilty beyond a reasonable doubt.

■■ Preliminarily, we note that this court will not reverse a criminal conviction unless the evidence is so improbable as to raise a reasonable doubt of defendant's guilt. (*People v. Vriner* (1978), 74 Ill. 2d 329, 342, 385 N.E.2d 671, *cert. denied* (1979), 442 U.S. 929, 61 L. Ed. 2d 296, 99 S. Ct. 2858.) In the case at bar, we do not find that defendants have met this standard for reversal.

■■ It is well settled that the testimony of a single credible witness who had ample opportunity to observe is sufficient to sustain a conviction, even when that testimony is contradicted by the accused. (*People v. Sullivan* (1970), 46 Ill. 2d 399, 263 N.E.2d 38.) In the instant case, we have two positive identifications of the defendants by the victim of the armed robbery. Furthermore, the testimony of Officers Daliege, Makowski and Matozzi at trial essentially corroborated the trial testimony of the victim. The defendants matched the victim's description given to the police; Hernandez' recovered gun in the alley matched the description as given by the victim; the receipts of the victim were found in the pockets of Martinez; and the victim's initial identification occurred less than ten minutes after the robbery. The jury heard the minor discrepancies in the testimony of the State's witnesses, as well as the alibi evidence put on by Hernandez. It is the

function of the jury to determine the credibility of the witnesses, the weight to be given their testimony and the inferences to be drawn from the evidence. (See *People v. Akis* (1976), 63 Ill. 2d 296, 298, 347 N.E.2d 733.) Where the evidence is merely conflicting, a court of review will not substitute its judgment for that of the jury. (See *People v. Clark* (1964), 30 Ill. 2d 216, 219, 195 N.E.2d 631.) We therefore find ample evidence in the record to establish each defendant's guilt beyond a reasonable doubt.

Finally, both defendants contend that the trial court erred in failing to grant their motions for new trial and petitions to vacate their convictions which were predicated upon "newly discovered evidence" contained in an affidavit from Beatrice Villalobos. We will now turn to consider the merits of defendants' arguments.

We initially note that applications for a new trial on the grounds of new evidence are not looked upon favorably by the court, and should be subject to the closest scrutiny. (*People v. Ramos* (1980), 80 Ill. App. 3d 722, 725, 400 N.E.2d 676.) Moreover, "the burden is upon the applicant[s] to rebut the presumption that the verdict is correct ***." (*People v. Holtzman* (1953), 1 Ill. 2d 562, 569, 116 N.E.2d 338.) Newly discovered evidence must be "conclusive and not merely cumulative, and the evidence must appear to be of such conclusive character that it will probably change the result if a new trial is granted." *People ex rel. Walker v. Pate* (1973), 53 Ill. 2d 485, 494, 292 N.E.2d 387.

In the present case, defendants rely upon Beatrice Villalobos' affidavit to show that defendant Hernandez' cousin, Juan Contreras, told Ms. Villalobos, that he, rather than Hernandez, was involved in the armed robbery of the victim. Although defendants' petitions to vacate judgment make mention of this document, the affidavit is not contained within the record on appeal. The responsibility for the proper preservation of the record for appeal falls on the appellant. (See *People v. Edwards* (1978), 74 Ill. 2d 1, 6, 383 N.E.2d 944, *cert. denied* (1979), 442 U.S. 931, 61 L. Ed. 2d 299, 99 S. Ct. 2862.) "Where the record is insufficient or does not demonstrate the alleged error, the reviewing court must refrain from supposition and decide accordingly." (74 Ill. 2d 1, 7, 383 N.E.2d 944.) Therefore, given the insufficient record before us, we believe there is a presumption in favor of the trial court's denial of defendants' motions. See *People v. Edwards* (1978), 74 Ill. 2d 1, 8, 383 N.E.2d 944, *cert. denied* (1979), 442 U.S. 931, 61 L. Ed. 2d, 299, 99 S. Ct. 2862.

For the foregoing reasons, the judgment of the trial court is affirmed as to both defendants.

Affirmed.

MEJDA, P.J., and SULLIVAN, J., concur.

SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

JUSTICE LORENZ delivered the opinion of the court:

In their separate petitions for rehearing, defendants Hernandez and Martinez both urge this court to allow them to supplement their record on appeal with the affidavit of Beatrice Villalobos. Hernandez contends that this court's allowance of this affidavit into the record will permit this court to consider the merits of Hernandez' petition to vacate his conviction and his motion for a new trial. He reasons that this affidavit was not in his record on appeal because his appeal was consolidated with that of defendant Martinez, and the clerk of the circuit court prepared the common law record from the pleadings, motions, etc., of defendant Martinez, and not those documents specifically pertaining to Hernandez' case. Further, Hernandez posits that because he included the affidavit in his motion to set bail pending appeal, which was served upon all parties to the appeal, we should have considered the merits of his petition and motion.

■■■ As we noted in our original disposition of this appeal, it is the responsibility of the appellant to properly preserve his record for appeal, and where the record is insufficient or does not demonstrate the alleged error, the reviewing court must refrain from supposition and decide accordingly. (*People v. Edwards* (1978), 74 Ill. 2d 1, 7, 383 N.E.2d 944, *cert. denied* (1979), 442 U.S. 931, 61 L. Ed. 2d 299, 99 S. Ct. 2862.) Notwithstanding the fact that Hernandez bore the responsibility of making sure that his record on appeal was complete, and the fact that the appellate court's file on a particular case (*i.e.*, motion to set bail pending appeal) is not the common law record which is to be reviewed by this court, we will consider defendant Hernandez' motion for a new trial and petition to vacate his conviction.

■■■ It is well settled that "Applications for a new trial on the ground of newly discovered evidence are not looked upon with favor by the courts, and in order to prevent, so far as possible, fraud and imposition which defeated parties may be tempted to practice, as a last resort, to escape the consequence of an adverse verdict, such application should always be subjected to the closest scrutiny by the court, and the burden is upon the applicant to rebut the presumption that the verdict is correct and to show there has been no lack of diligence. The matter is largely discretionary with the trial court, and

the exercise of its discretion will not be disturbed except in case of manifest abuse." *(People ex rel. Walker v. Pate* (1973), 53 Ill. 2d 485, 493, 292 N.E.2d 387, quoting from *People v. Holtzman* (1953), 1 Ill. 2d 562, 569, 116 N.E.2d 338.) In order to warrant a new trial based on newly discovered evidence, the evidence must be of such conclusive character that it will probably change the result on retrial. It must also be noncumulative, discovered after trial, and be of such character that it could not have been discovered before trial by the exercise of due diligence. *People v. Miller* (1980), 79 Ill. 2d 454, 464, 404 N.E.2d 199.

In the present case, defendants based their respective motions for new trials on the affidavit by Beatrice Villalobos which stated that an individual known to her as Juan Contreras (the cousin of defendant Hernandez) approached her at a disco and told her that he and not Hernandez was involved in the armed robbery of a pizza truck on December 29, 1979, but that he could not turn himself in because of his criminal record. Villalobos further averred that subsequent to the conversation with Contreras, she repeated what Contreras had said to Laurie Ward. In addition to the affidavit tendered to the trial court, defendants attached photos of both Hernandez and Contreras as exhibits, in order to show similarities in their appearance. In addition to their motion for a new trial, defendants also petitioned the trial court to vacate their convictions; they based their petitions on this affidavit. A third motion was filed with the court for the issuance of a warrant for the arrest of Contreras. All three motions were denied by the trial court.

With reference to the affidavit of Beatrice Villalobos in question, we initially find that it was based on hearsay and not Villalobos' personal knowledge and was therefore inadmissible, as it has long been the general rule that extrajudicial declarations of a third party, not made under oath, that he committed the crime, are purely hearsay, and, even though they are declarations against interest, are inadmissible. *(People v. Tate* (1981), 87 Ill. 2d 134, 143, 429 N.E.2d 470.) However, this rule should not be indiscriminately applied, and the supreme court suggested that four factors be considered to determine the trustworthiness of the third-party declaration. *(Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038.) The factors to be considered are (1) whether the statement was made in a spontaneous manner to a close acquaintance a short while after the crime; (2) whether the statement was, in fact, against the declarant's interest; (3) whether the statement was corroborated by other evidence; and (4) whether the declarant was available for cross-examina-

tion. (410 U.S. 284, 300-01, 35 L. Ed. 2d 297, 312, 93 S. Ct. 1038, 1048-49.) The absence of a single factor in the four-factor test has resulted in the hearsay declaration's being labelled as inadmissible. *People v. Foster* (1978), 66 Ill. App. 3d 292, 294-95, 383 N.E.2d 788.

In the case at bar, there was no representation that the statement was made to Villalobos shortly after the crime was committed; in fact, it was allegedly made after the jury had convicted the defendants of the crime. Also, the affidavit clearly indicated that Contreras had intended to avoid criminal liability, and would therefore not be available for cross-examination. Additionally, Contreras' statement was not corroborated by other evidence. We are therefore of the opinion that the trial court did not abuse its discretion in its denial of defendant Hernandez' motion for a new trial, petition to vacate his conviction and motion for a warrant for the arrest of Contreras, in that all three of these motions were based on this affidavit which we deem inadmissible.

With regard to defendant Martinez' petition for rehearing, we find no abuse of discretion on the part of the trial court in denying his motion for a new trial and petition to vacate his conviction. Both Martinez' motion and his petition were based on an affidavit, which was not only inadmissible, but which also contained no new evidence which would change the result of the jury's guilty verdict rendered against him.

Defendants point to our statement in the main opinion concerning the technical requirements of section 24—1(a)(4) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 24—1(a)(4)) and argue that at the time of the events in question, this section required that a weapon be concealed in a vehicle in order to constitute a violation of this section. Although this argument is a fuller statement of the technical requirements of this section, our comments in the main opinion were addressed to probable cause, and we believe defendants' arguments do not affect our analysis of probable cause in this case. We stand firm in our finding that probable cause existed to arrest defendants for possible violations of section 24—1(a)(4), based on Officer Daliege's testimony that he saw two guns thrown from the windows of a car carrying three individuals which was travelling down an alley in the middle of the night, at a slow rate of speed, without its headlights on.

The petition for rehearing is denied.

MEJDA, P.J., and SULLIVAN, J., concur.