THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICHIE COLE et al., Defendants-Appellants.

First District (2nd Division)   Nos. 85—2108, 85—2129 cons.

Opinion filed March 16, 1988.—Rehearing denied April 7, 1988.

174

Paul P. Biebel, Jr., Public Defender, of Chicago (Jeffrey M. Howard and Steve Wagner, Assistant Public Defenders, of counsel), for appellant Richie Cole.

Steven Clark and Gordon H. Berry, both of State Appellate Defender's Office, of Chicago, for appellant Anselm Holman.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., John A. Gasiorowski, and Ado L. Rugai, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

The defendants, Anselm Holman and Richie Cole, were charged by indictment with murder, rape, residential burglary, robbery, home invasion, and aggravated kidnapping. After being tried by separate

juries, each of them was found guilty of all charges except that of aggravated kidnapping. The trial judge sentenced Holman to concurrent terms of natural life for murder, extended terms of 60 years each for rape and home invasion, and 30 years for residential burglary; Cole was given concurrent terms of 40 years for murder, 30 years each for rape and home invasion, and 15 years for residential burglary. It is from those convictions that defendants appeal.

Before the trial, the court granted defense counsel's motion for a severance because it found that the defendants had antagonistic defenses; however, the cases have been consolidated for appeal.

Prior to the selection of Holman's jury, his counsel tendered certain questions to the court to be asked of prospective jurors during *voir dire* of the type which our supreme court had approved in *People v. Zehr* (1984), 103 Ill. 2d 472, 469 N.E.2d 1062. These questions were intended to establish whether the jurors were able to return a not-guilty verdict, whether they would hold it against the defendant if he did not testify, and their understanding of the concept that the defendant was not required to present any evidence. However, during *voir dire* the court for the most part did not ask these questions; but prior to individual juror questioning, it admonished the venire as follows:

> "The indictment in this case is not to be considered as any evidence or presumption of guilt against the defendant. It is a mere formal charge necessary to place the defendant upon trial. The defendant, under the law, is presumed to be innocent of the charge in the indictment, and this presumption remains with him throughout the trial, until you have been satisfied by the evidence in this case beyond all reasonable doubt as to the guilt of the defendant, and the burden of proving the guilt of the defendant beyond all reasonable doubt is on the State.
>
> The law does not require the defendant to prove his innocence. Does anybody disagree with that proposition of law? If so please raise your hands. Again I see no hands, so I can presume that you do not disagree, that you do agree with that proposition of law."

The defendants filed a pretrial motion to suppress certain evidence and statements and to quash arrest. At the hearing held on that motion Detective Ralph Vucko testified that he had been conducting a homicide investigation involving a 75-year-old victim named Mary Brackenridge, and after doing some preliminary investigation, he learned that a person nicknamed "Main" might have information about the case. Upon locating "Main," Vucko learned that "Main"

was a nickname for Anselm Holman. Holman indicated that he was aware of Brackenridge's murder and although he was not placed under arrest at this time, he agreed to accompany Vucko to the police station because he had been at the victim's house on the night in question, May 11, 1984.

Holman then directed Vucko and his partner, Detective Vic Switski, to the residence of Richie Cole, who was his companion on the night of May 11. Cole was not present, so Switski left his business card with Ken Cole, Richie Cole's brother, and asked him to inform Richie that the police wanted to talk with him regarding Brackenridge's death.

Holman then guided the detectives to the residence of Cole's girlfriend, where Switski found Cole and asked him to accompany them to the police station for an interview about Brackenridge's death. Cole agreed to go and was put into the back of the squad car. According to the officers, Cole was not under arrest at this time, and the officers admit that they did not then have sufficient probable cause to arrest Cole; nevertheless, Cole testified that he believed he was required to follow the officers and was under arrest. During the 45-minute ride to Area 4 Headquarters, the officers ordered Holman and Cole not to talk to each other.

Upon arrival at the police station, Cole and Holman were placed in separate interview rooms, the doors to which were closed. Before Cole was interrogated he was given *Miranda* warnings, and during the half-hour interview he gave a statement wherein he implicated himself and Holman, after which both were placed under arrest for murder. Several hours later Cole gave Assistant State's Attorney Scott Nelson another incriminating statement that was immediately reduced to writing. Present during his final oral statement and the transcription thereof was a youth officer who was not present, however, for his initial statement or for a lineup in which Cole participated. Although there is no evidence in the record that the police contacted Cole's mother, she did arrive at the police station prior to his final statement.

Cole's statements were substantially identical and were as follows. Holman told Cole that he knew where they could get some money. They went there and knocked on the front door, but nobody answered. Holman then told Cole to stay on the front steps and watch for police while he went around to the rear of the building. Several minutes later Holman let Cole in the front door, and they proceeded to the second floor, where they saw the decedent and a young boy, later identified as eight-year-old Ricky Brown, sleeping on a couch.

Holman told Cole to put the boy in a closet, which he did. Cole thereafter saw Holman push the decedent onto a bed, pull her undergarments off, and proceed to have sexual intercourse with her. Cole then left the bedroom, closed the door, and stayed in an adjacent room. Several minutes later, Holman came out and asked Cole if he wanted to have sexual intercourse, but he refused. Holman returned to the bedroom and shut the door. The victim was crying, then she became silent, and thereafter Holman left the bedroom. Cole and Holman went on to search the apartment, and when they could find nothing of value, they left.

Holman also gave a statement to Nelson wherein he admitted that he entered through the back door and raped the deceased. He also acknowledged that Cole had complied with his request to put the child in a closet. He confirmed Cole's statement that he had asked Cole if he wanted to have sexual intercourse with the deceased, but Cole declined. The main difference in their statements was Holman's contention that Cole had held Brackenridge's mouth to keep her quiet while the two of them were searching for money. The court denied the defendants' motion to suppress the statements and evidence and to quash the arrest.

Neither Cole's nor Holman's statement was a verbatim transcript of what they had said; instead Assistant State's Attorneys Joseph McNerney and Scott Nelson reduced their statements to written narrative form, and they were then signed by Cole and Holman. McNerney and Nelson were allowed to testify at trial, over objection, that these statements were accurate representations of what the defendants had narrated to them. Cole testified at trial that he was not advised of his constitutional rights and that he had been punched in the face.

Ricky Brown testified that he had been put in the closet and had seen Brackenridge on the bed with a white substance flowing from her mouth. The next morning Brown told his neighbor Elijah Hall what had happened. Hall testified that he found the victim lying on the bed with her dress pulled up. Officer Kenneth Smith also testified that when he arrived at the scene of the murder the victim was lying on the bed with her dress pulled up.

Dr. Eupil Choi performed an autopsy and testified that Brackenridge had been murdered by asphyxia. Moreover, he indicated that her vaginal canal was bruised and that spermatozoa was present.

Several witnesses who identified themselves as plumbers testified at trial that they saw Holman and Cole at the victim's apartment at approximately 8 p.m. on the night of the murder.

The juries were selected on a Friday and the trial was scheduled to begin on the following Monday. On the Monday after the juries had been chosen, the State advised the court that late on Friday afternoon it had found Kenneth Shelton, whom it had been unable to locate previously. Defense counsel interviewed him and made an offer of proof that Shelton knew an individual who previously had suggested stealing property from the deceased's apartment and had made certain admissions to Shelton regarding his involvement in the case. The trial court denied the defense's motion for a continuance, ruling that counsel could have Shelton's allegations investigated during the three-day trial.

As previously noted, the juries found both Holman and Cole guilty of murder, rape, home invasion, and residential burglary. The trial judge concluded that Holman had murdered the victim during the commission of the rape and sentenced him to natural life in prison for murder, extended terms of 60 years each for rape and home invasion, and 30 years for residential burglary, all terms to be served concurrently. Because the judge believed that Cole's involvement was not as great, he sentenced Cole to 40 years in prison for murder, 30 years each for both rape and home invasion, and 15 years for residential burglary; these also were concurrent terms.

Opinion

## I

Cole's principal argument is that his fourth amendment rights were violated when the police took him into custody for interrogation without probable cause for his arrest. Although Holman might also have a colorable fourth amendment argument, he has chosen not to raise it before this court; thus any defense he has on this ground has been waived. The police officers themselves admitted that they did not have probable cause to arrest Cole prior to his being interrogated. All they knew at the time was that he had been with Holman at the victim's residence on the night of her murder. Clearly such a paucity of evidence, as the police conceded, does not constitute probable cause. See *People v. McGhee* (1987), 154 Ill. App. 3d 232, 237-38, 507 N.E.2d 33.

The law is firmly established that an individual's fourth amendment rights are violated if he is "seized" and then questioned while in custody on less than probable cause. (*People v. Dunaway* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248; *People v. Miller* (1980), 89 Ill. App. 3d 973, 412 N.E.2d 175, *cert. denied* (1981),

454 U.S. 871, 70 L. Ed. 2d 175, 102 S. Ct. 339.) The recognized test is whether a reasonable, innocent person would have considered himself to be under arrest. *People v. Reynolds* (1983), 94 Ill. 2d 160, 165, 445 N.E.2d 766; *People v. Clay* (1984), 124 Ill. App. 3d 140, 148, 463 N.E.2d 929.

Many of the relevant factors which should be considered in determining whether a defendant made a statement in a custodial setting are delineated in the following passage:

"[T]he location, time, length, mood and mode of the interrogation; the number of police officers present and the presence or absence of friends or family of the accused; any *indicia* of formal arrest of the subject including physical restraint, show of weapons or force, booking, fingerprinting or informing the person he is under arrest; the manner in which the person questioned got to the place of interrogation, *i.e.* voluntarily on his own, in response to a police request, or on a verbal command indicating compulsion; whether he voluntarily assists police in their interrogation; whether the subject is allowed to walk within and from the location of the interrogation unaccompanied by police; and the age, intelligence, and mental makeup of the accused." *People v. Finklea* (1983), 119 Ill. App. 3d 448, 452, 456 N.E.2d 680.

See also *People v. Savory* (1982), 105 Ill. App. 3d 1023, 435 N.E.2d 226.

■■ One of the most telling factors in the instant case is the age of the accused: he was a juvenile, 16 years old. We have noted on another occasion that our courts must be especially cautious in cases involving juveniles because the coerciveness of a situation is thereby enhanced. (*People v. Travis* (1984), 122 Ill. App. 3d 671, 462 N.E.2d 654; see also *Haley v. Ohio* (1948), 332 U.S. 596, 599, 92 L. Ed. 224, 228, 68 S. Ct. 302, 303-04.) In response to the potential for abrogating the rights of juveniles, our legislature has enacted the Juvenile Court Act, which provides that when a juvenile is taken into custody, his parent or guardian and a youth officer should be immediately notified. (Ill. Rev. Stat. 1985, ch. 37, par. 703—2.) In this case, the police violated the Act by failing even to attempt to notify Cole's mother, and notified a youth officer only after he had been in custody for several hours.

■ The State cites two cases for the proposition that Cole's rights were not violated, but both can be readily distinguished because they involve adults, and not juveniles. (*People v. Holloway* (1985), 131 Ill. App. 3d 290, 475 N.E.2d 915; *People v. Sanders* (1981), 103 Ill.

App. 3d 700, 431 N.E.2d 1145, *cert. denied* (1982), 459 U.S. 871, 74 L. Ed. 2d 131, 103 S. Ct. 157.) Moreover, *Holloway* can be distinguished on the additional ground that the defendant there never received his *Miranda* warnings, whereas they were given in this case. As for *Sanders*, not only did that case not involve a juvenile, but it lacks the added circumstances of an individual being transported to the police station with a friend with whom he was not allowed to speak during a 45-minute ride in a police car and later was questioned in a room with a closed door.

When analyzing the problematic features present in this case, we are drawn irresistibly to the conclusion that Cole was seized in violation of his fourth amendment rights. Cole, as we have already indicated, was 16 at the time of the commission of the crime in this case. Prior to May 11, 1984, he had never been arrested, spoken with the police, or been in a police car, and the only time he had been in a police station was many years earlier, on which occasion he was not in any trouble with the police. Officer Switski left his business card with Richie Cole's brother, but at that time Cole's family was not put on notice that the police considered him a suspect in a crime.

When the officers found Cole at his girlfriend's residence, they *asked* him to accompany them to the police station for questioning, *took* him downstairs, and *put* him into the police car. During the 45-minute ride to the station, Cole and Holman were forbidden to speak with each other. Upon arrival at Area 4 Headquarters, Cole was placed in an interrogation room, the door of which was closed, except when people entered or exited the windowless room. Both Vucko and Switski were present when he was given his *Miranda* warnings and questioned for approximately 30 minutes. It was not until after this statement and a lineup that a youth officer was contacted and Cole's mother arrived at the police station, although she still had not been notified by the police of her son's whereabouts. Several hours later Cole made a statement to Assistant State's Attorney Nelson. Not once during this period of interrogation was Cole told that he was free to leave.

In *McGhee*, a 16-year-old was asked at 5 p.m. to accompany the police officers to the station. The defendant was taken from his uncle's home, where he had been residing, and the officers left a business card with the uncle. (*McGhee*, 154 Ill. App. 3d at 234.) At the station, the defendant was given his *Miranda* warnings and was interrogated twice before his mother was permitted to talk with him by telephone, although when she arrived she was not allowed to speak with her son. During the second interview, after learning of another

individual's statement that the defendant had been present at the scene of the murder, he admitted his presence but denied any involvement in the crime. (*McGhee*, 154 Ill. App. 3d at 235.) The defendant was given his *Miranda* warnings again and questioned several more times, and he was even confronted with the person who said that McGhee was present at the scene of the crime. At approximately 4 a.m. both a court reporter and a youth officer were called and were present when the defendant gave his statement, which he signed at 5:15 a.m. (*McGhee*, 154 Ill. App. 3d at 236.) During this 12-hour period, the youth was never told that he was free to leave.

This court began by noting that the police had violated the Juvenile Court Act (Ill. Rev. Stat. 1985, ch. 37, par. 703—2), by failing even to attempt to notify the juvenile's parent that he was in custody and by not having a juvenile officer present until the very end of McGhee's interrogation. In the instant case, the police committed the identical violations. The court in *McGhee* noted that such transgressions should be considered when determining whether an individual's fourth amendment rights were breached, but that a violation of the statute was not a *per se* denial of a juvenile's constitutional rights. (*McGhee*, 154 Ill. App. 3d at 236-37.) Yet coupled with the length of the interrogation and the lack of probable cause, the court held that the defendant's fourth amendment rights had been violated. *McGhee*, 154 Ill. App. 3d at 240.

In *People v. Fitzpatrick* (1982), 107 Ill. App. 3d 876, 438 N.E.2d 222, the defendant was taken to the police station, received his *Miranda* warnings, and gave a statement. The court suppressed the statement as violative of his fourth amendment rights primarily because the police did not inform the defendant that he was free to go. (*Fitzpatrick*, 107 Ill. App. 3d at 879; accord *People v. Dowdell* (1980), 81 Ill. App. 3d 266, 270, 401 N.E.2d 295, *cert. denied* (1980), 449 U.S. 974, 66 L. Ed. 2d 236, 101 S. Ct. 385.) The State's attempt to distinguish *Fitzpatrick* on the basis that the defendant therein was not initially told of the reason for the police questioning is unconvincing; the difference is illusory. However, the State does succeed in distinguishing *People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103, *cert. denied* (1982), 459 U.S. 878, 74 L. Ed. 2d 143, 103 S. Ct. 174, wherein the court suppressed evidence obtained by questioning an adult over an 11-hour period and medically examining him for evidence. The interrogation in the instant case was certainly not as intrusive as in *Townes*; thus, Townes is inapposite to the instant case.

Another case on point is *People v. Travis* (1984), 122 Ill. App. 3d 671, 462 N.E.2d 654, in which a juvenile was brought into a police

station twice and released both times. On both occasions he received *Miranda* warnings and gave a statement which placed him at the scene of the crime and was arrested about one month after he was questioned. (*Travis*, 122 Ill. App. 3d at 672.) The court suppressed the statements, even though the defendant stated that he "voluntarily" accompanied the officers. *Travis*, 122 Ill. App. 3d at 675.

After analyzing all of the factors and examining the relevant case law, we believe it to be unmistakably clear that Cole was taken into custody. The State maintains that even if Cole were improperly seized, his statements were so attenuated from the allegedly improper actions that they should not be suppressed. Its argument that Cole's confession was not the fruit of an illegal arrest and was sufficiently attenuated fails to persuade us.

■ The prosecution must show more than the mere circumstance that *Miranda* warnings were given in order to prove attenuation. (*Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254; *McGhee*, 154 Ill. App. 3d at 238.) There are three determinants: the time between the illegal arrest and the incriminating statements, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. *Brown*, 422 U.S. at 603-04, 45 L. Ed. 2d at 426-27, 95 S. Ct. at 2261-62.

■ Cole's initial incriminating statement was given almost immediately upon arrival at the police station. Surely enough time had not transpired to constitute attenuation. *Dunaway*, 442 U.S. at 217, 60 L. Ed. 2d at 838-39, 99 S. Ct. at 2259; *Brown*, 422 U.S. at 604, 45 L. Ed. 2d at 427, 95 S. Ct. at 2262; *People v. Sturdivant* (1981), 99 Ill. App. 3d 370, 425 N.E.2d 1046 (nine hours not enough time to sufficiently attenuate the causation between the illegal arrest and the statement).

As for the second factor, the State points to a detective's admonition to Cole to "tell the truth" as the intervening factor. The defendant logically replies that if a *Miranda* warning is not enough to cause attenuation, then neither is the detective's imprecation to "tell the truth."

Finally, there is the matter of the officials' conduct. Besides the illegal custody of Cole, they waited too long to allow him contact with his mother and with a youth officer, in violation of the Juvenile Court Act (Ill. Rev. Stat. 1985, ch. 37, par. 703—2), and did not even immediately inform his mother of his whereabouts. The actions of the police in seizing and interrogating Cole present a clinical case of unreasonable police behavior.

In conclusion, Cole's statements were the result of an illegal ar-

rest and should be suppressed. He does not question the sufficiency of the evidence, so there is no double jeopardy problem in remanding the cause against him for a new trial. *McGhee*, 154 Ill. App. 3d at 240.

## II

■ Holman asserts that the trial judge's refusal to ask the venire the questions he proposed was reversible error. He contends that *People v. Zehr* (1984), 103 Ill. 2d 472, 469 N.E.2d 1062, requires the judge to ask the exact questions proposed by defense counsel regarding the presumption of the defendant's innocence, that he is not required to offer any evidence, and that he did not have to testify.

The State responds that the trial judge satisfied the requirements of *Zehr*. They note that the supreme court's opinion states that "although they [the questions] need not have been asked in precisely the form submitted, the subject matter of the questions should have been covered in the course of interrogation on *voir dire*." (*Zehr*, 103 Ill. 2d at 477.) In the instant case, the trial court did discuss the subject matter of the proposed questions and gave the prospective jurors an opportunity to indicate their inability or unwillingness to adhere to the applicable rules of law. We are thus presented with the frequently recurring case of a trial judge properly using his discretion in deciding exactly the format of the questioning during *voir dire*. (*People v. Williams* (1987), 159 Ill. App. 3d 527, 512 N.E.2d 35; *People v. Leamons* (1984), 127 Ill. App. 3d 1056, 469 N.E.2d 1137.) We find Holman's challenge to the trial judge's conduct in selecting the jury herein to be without merit.

## III

■ Holman next argues that the trial judge should have granted him a continuance in order that he could attempt to locate L.C., the person whom Shelton stated had admitted "involvement" in the case. The decision whether to allow a continuance for the purpose of obtaining the presence of a witness is within the sound discretion of the trial court and will not be disturbed on appeal without a showing of a clear abuse of discretion. *People v. Bryant* (1983), 115 Ill. App. 3d 215, 221, 450 N.E.2d 744; *People v. Rivera* (1978), 64 Ill. App. 3d 49, 380 N.E.2d 1018.

In the case *sub judice*, the trial judge's decision cannot be characterized as an abuse of discretion. He permitted defense counsel to interview Shelton; counsel also had time during the three-day trial to attempt to secure L.C.'s presence. Moreover, as the State notes, the denial of a motion for a continuance is not an abuse of discretion if

there is no reasonable expectation that a witness will be available in the foreseeable future. (*People v. Roberts* (1985), 133 Ill. App. 3d 731, 735, 479 N.E.2d 386; *People v. Tyler* (1975), 28 Ill. App. 3d 538, 540, 328 N.E.2d 585.) The trial judge appears to have had grounds to conclude that L.C. would be unavailable, especially since Holman was apparently unable to locate him in three days. Holman points to nothing in the record which enables us to reach a conclusion more favorable to him. The State adequately distinguishes *People v. Lott* (1977), 66 Ill. 2d 290, 362 N.E.2d 312, wherein our supreme court held that the trial court erred in denying counsel's request for a continuance to refute certain rebuttal testimony. Unlike *Lott*, in this case the juries received no evidence as to L.C. or any possible involvement he may have had in the rape and murder of the victim; therefore, the risk of unfair prejudice because of the introduction of improper evidence to the jury was not present. Moreover, there was not even the semblance of a guarantee that L.C. had any information which would impact upon Holman's case; Shelton had merely said that the person to whom he had referred indicated that he was "involved," which encompasses a wide spectrum of behavior and would not necessarily have aided Holman's defense. Therefore, there was no assurance that L.C. could have offered any evidence which would have been relevant in the instant case. In light of the above, the trial court's decision to deny the defense's motion for a continuance was not reversible error.

## IV

Holman advances the rather novel suggestion that the jury placed undue emphasis on the testimony given by Nelson and McNerney because they were allowed to testify as to the accuracy of the written narrations they made of the information they obtained in their interrogation of the defendants. They of course did not testify as to the accuracy of the statements themselves; their testimony was a description of the events surrounding the defendants' arrests, including the substance of their conversations with the defendants. Moreover, Holman never denied that his statement was an accurate depiction of his oral statements; rather, he claimed the statement was coerced and that he did not sign it. Consequently, the testimony of Nelson and McNerney as to the accuracy of their transcriptions of the statements does not constitute reversible error. Nor can we conclude that this testimony could have improperly influenced the jury in its duty to resolve factual disputes, assess witness credibility, and determine the weight and sufficiency of the evidence. *People v. Steffens* (1985), 131 Ill. App. 3d 141, 475 N.E.2d 606; *People v. Martinez*

(1984), 129 Ill. App. 3d 145, 472 N.E.2d 464.

## V

█ Holman asserts that his sentence of natural life was excessive. The State notes that sentencing is a matter of judicial discretion and that a reviewing court should not alter a sentence merely because it would have imposed a different punishment. (*People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541; *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882; *People v. Holloway* (1983), 119 Ill. App. 3d 1014, 457 N.E.2d 466.) The trial judge was authorized by statute to impose a life sentence if he found that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1; *People v. Wilson* (1985), 132 Ill. App. 3d 862, 478 N.E.2d 556.

The defendant's argument relies on *Holloway*, which is easily distinguishable from the case at bar. In that case, the trial court itself found that the co-defendants had equal complicity in a murder, yet it sentenced only one of them to life in prison. Here the trial court found that Holman was more responsible for the murder, and certainly his leadership role throughout his criminal endeavor with Cole was sufficient evidence upon which to reach that conclusion. Moreover, Cole was a juvenile, an appropriate reason for the court to impose a less severe sentence on him. (*People v. Szabo* (1983), 94 Ill. 2d 327, 447 N.E.2d 193.) Given that the rape and murder by strangulation of a 75-year-old woman is heinous behavior indicative of wanton cruelty, the trial judge was incontestably justified in sentencing Holman to natural life in prison.

## VI

█ Holman's final argument is that the trial court erred in giving him extended terms for rape and home invasion, citing *People v. Jordan* (1984), 103 Ill. 2d 192, 469 N.E.2d 569, because those crimes were not the most serious of which he was convicted. The State responds by citing *People v. Neal* (1985), 111 Ill. 2d 180, 489 N.E.2d 845, *cert. denied* (1986), 106 U.S. 1165, 90 L. Ed. 2d 733, 106 S. Ct. 2292, wherein the court held that it was permissible to impose extended terms on individuals who also received the death penalty. The court reasoned as follows:

> "The sentence here, however, was not for a term of years. A death sentence was imposed, and the extended-term statutory provision was not applicable. The statute authorizing extended terms refers to and is bottomed on, in a sense, the maximum

sentences 'authorized by Section 5—8—1,' to which it refers. That section refers to terms of imprisonment and does not include capital sentences." *Neal*, 111 Ill. 2d at 204.

This passage has been interpreted in two different ways by this court in cases involving life sentences instead of the death penalty. In a case currently pending before our supreme court, the First District has held that since a life sentence is not a term of years, the logic of *Neal* obtained; thus, the sentence was not in error. (*People v. Young* (1987), 152 Ill. App. 3d 361, 504 N.E.2d 115.) We agree with the Third District's conclusion that the general rule forbidding an extended-term sentence based on an offense which is not within the most serious class governs cases where a life sentence was imposed. (*People v. Treece* (1987), 159 Ill. App. 3d 397, 511 N.E.2d 1361.) We think that the result in *Treece* is accurate in its holding that the *Neal* rationale applies solely in death penalty cases for the reason that such a penalty is not provided for in section 5—8—1(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)). However, since life imprisonment is provided for in this section of the statute, the trial court was not authorized to give Holman extended-term sentences for rape and home invasion.

Accordingly, we reverse Cole's convictions and remand for a new trial. As for Holman, we affirm all of his convictions and his sentences for murder and residential burglary. Pursuant to our authority under Supreme Court Rule 615(b)(4) (107 Ill. 2d R. 615(b)(4)), we reduce Holman's sentences for rape and home invasion to 30 years, the maximum sentence for these Class X felonies.

Affirmed in part; reversed in part; modified in part and remanded for further proceedings consistent with this decision.

HARTMAN, P.J., and BILANDIC, J., concur.