THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PATRICK BROWN, Defendant-Appellant.

First District (2nd Division)   No. 1—90—1530

Opinion filed September 22, 1992.

Randolph N. Stone, Public Defender, of Chicago (Elyse Krug Miller, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Jennifer A. Kuhn, Assistant State's Attorneys, of counsel), for the People.

JUSTICE DiVITO delivered the opinion of the court:

Allie Larkin was beaten and robbed in her home in Chicago on October 4, 1988; she later died from her injuries. A jury convicted defendant Patrick Brown, then a 16-year-old neighbor of Ms. Larkin, of first degree murder and residential burglary, and the circuit court sentenced him to concurrent terms of 45 years for the murder and 15 years for the residential burglary. He appeals, claiming (1) the circuit court erred in finding that his custodial statement was voluntary; (2) the prosecutor's remarks during his rebuttal argument denied him a fair trial by distorting the function of the jury and appealing to its sympathy for Ms. Larkin; (3) the circuit court erred in refusing to redact portions of his custodial statement concerning his two co-offenders' plans for the proceeds of the burglary; (4) his murder sentence was excessive in light of his age and remorse; and (5) the circuit court improperly sentenced him on three counts of murder for the death of a single victim. We affirm the convictions and the sentences, but we remand for entry of an order showing a single conviction for first degree murder.

Certain facts are not in dispute.

Ms. Larkin's neighbor saw two young men he recognized leaving her house through a side window a few minutes after she had gone inside. The police were called, and when they arrived, they found Ms. Larkin on the floor of her home, bound, gagged, and bleeding profusely but still alive. Police picked up the two young men late that night; after questioning them, the police began looking for defendant. Early the next afternoon, aware that the police were seeking him, defendant and his mother, along with his girl friend, were leaving his house on their way to the police station when the police arrived. Defendant was placed in one police car; his mother and girl friend were transported in another.

At the Area 1 Violent Crimes office (Area 1), on the second floor of the police station building, police officers and an assistant State's Attorney questioned defendant at approximately 1:30 p.m. (the 1:30 p.m. interrogation). At 7 p.m. he was questioned again by police and

the assistant State's Attorney (the 7 p.m. interrogation), and he gave a statement to a court reporter implicating himself in Ms. Larkin's murder. He then signed it in the presence of his mother and a youth officer, both of whom signed it as well. He had been given nothing to eat or drink during his six hours at Area 1 and had not slept the night before.

Prior to trial, defendant moved to suppress his custodial statement. In his motion, he claimed that he had not been given *Miranda* warnings prior to the 7 p.m. interrogation and that his custodial statement was the result of physical, mental, and psychological coercion and thus was inadmissible because it was involuntary.

At the hearing on the motion, Sergeant James Swistowicz testified that defendant arrived at Area 1 at approximately 1 p.m. on October 5, 1988. He first talked with defendant at 1:15 p.m. for about 15 or 20 minutes; another police officer, Detective Armata, and an assistant State's Attorney were present, but not a youth officer. Defendant's mother was present also, and she was in the room "the whole time." The assistant State's Attorney told defendant that she was not his attorney and recited the *Miranda* warnings from memory; when she asked defendant if he understood each one, he replied that he did. She did not, however, obtain a written *Miranda* waiver. When she asked defendant if he would agree to make a statement to a court reporter, he responded affirmatively. Defendant did not ask to consult an attorney, nor did he say he wished to remain silent. Swistowicz, Armata, and the assistant State's Attorney went to the crime scene after talking to defendant. When Swistowicz returned, defendant's mother was sitting in the same place she had been sitting when he left. Swistowicz did not strike defendant in the jaw, nor did defendant complain to him at any time about such treatment by others. Neither he nor anyone in his presence told defendant that if he did not tell what had happened the day before "they would kick his ass and beat him up." He also denied taking defendant's clothes and refusing any request by defendant to talk with his mother. At one point he testified that he did not recall whether defendant had been handcuffed, but later said that he did not believe so. He did not speak again with defendant after the 1:30 p.m. interrogation, and thus he was not present for the statement to the court reporter.

Detective Ronald Armata's testimony mirrored Sergeant Swistowicz's. He stated that he, Swistowicz, the assistant State's Attorney, and defendant's mother had been present for the 1:30 p.m. interrogation, which he said had lasted 30 or 45 minutes. The assistant State's Attorney recited the *Miranda* warnings from memory and told defend-

ant that she was not his attorney. Afterward, Armata, Swistowicz, and the assistant State's Attorney went to the crime scene, returning to Area 1 at 3 or 3:30 p.m. He did not believe that he talked again to defendant, nor did he know if anybody else did. He did not recall defendant's mother asking to see her son. Neither he nor anyone in his presence struck defendant either at the 1:30 p.m. interrogation or during the statement to the court reporter, nor had anyone threatened him; defendant did not complain about such conduct by others. Armata responded "not to my knowledge" when asked if defendant had been handcuffed to the wall. He stated that a youth officer was not notified of defendant's presence until after the 1:30 p.m. interrogation, but he was unable to say when the youth officer had been notified or arrived.

Assistant State's Attorney Mary Beth Kinnerk testified next. She stated that at approximately 1:30 p.m., after speaking briefly with the officers, she entered the room where defendant was being held. She interviewed him for approximately 30 minutes, first telling him that she was not his attorney and reading the *Miranda* warnings "[f]rom the FOP book as [she] always do[es]," pausing after each one to ask if he understood, which he said he did. She did not ask defendant to sign a written *Miranda* waiver form. Defendant's mother and the police officers were present throughout. After the 1:30 p.m. interrogation, she asked to go to the crime scene; when she returned to Area 1 at approximately 3:30 p.m., defendant was in the same room in which she had conducted the earlier interrogation. Kinnerk advised defendant's mother of what she had learned from her visit to the Larkin home, and she then spoke with defendant in his mother's presence, but with no police officers in the room, for approximately 30 or 45 minutes (the 3:30 p.m. interrogation). During this conversation, defendant's mother, who was "a very active participant," told defendant to tell the truth, and he agreed to make a statement to a court reporter. Kinnerk noticed no facial bruising or bleeding, nor did she ever see a police officer strike defendant. Defendant did not ask her for medical attention. She had no knowledge whether defendant had been handcuffed or whether defendant's clothes had been taken from him. Later, before calling the court reporter, Kinnerk returned briefly, alone, to ask defendant about force or other mistreatment "to assure for [her]self that the statement was in fact being given voluntarily."

Youth officer Alberta Gordon's stipulated testimony was that she arrived for her shift at 4:30 p.m. on October 5, but she was not asked to assist in this case until 6:30 p.m.

Over defendant's objection, the court permitted the State to introduce portions of the statement that negated defendant's motion, includ-

ing his agreement that Kinnerk had earlier advised him of his constitutional rights, that he nevertheless would speak with her and the police on the record, that no threats or promises had been made to him in return for the statement, and that the statement was made "of [his] own free will."

Defendant's first witness was his mother. She stated that he was 16 years old in October 1988 and was in the 10th grade. After she arrived at Area 1, she was permitted to remain near the room in which defendant was being held, but when she asked to see her son right after they all arrived, she was told that he "was being processed"; she received the same answer on at least three other occasions. She was able to talk to defendant alone for only five minutes, just before the 7 p.m. interrogation. When she saw police officers with defendant's clothes and asked why they had them, the officers replied that they were testing them for blood. She conceded that she signed defendant's statement to the court reporter, in which he said he made the statement of his own free will and he had no complaints of his treatment, but stated that she did so only because defendant in fact said these things in her presence during the 7 p.m. interrogation. She also testified that defendant was struck by the police after, but not before, making the statement.

Defendant's 15-year-old girl friend testified next. She stated that defendant's mother had not been permitted to speak with defendant until 7 p.m. despite three earlier requests to do so. She too testified that police officers had taken defendant's clothes during the afternoon, but they returned them before the 7 p.m. interrogation. She said that from where she was sitting at Area 1, she could see and hear defendant and police officers shouting at each other, but she could not discern what they were saying.

Defendant also testified on his own behalf. He said that in the police car on the way to Area 1, the police did not talk about the case or threaten him, but they "told [him] what they would do to [him]" and then said "yeah, we got your ass." When he arrived at Area 1, the police handcuffed him to a rail and talked to him for 5 or 10 minutes without first giving *Miranda* warnings, but they did not question him about the incident. When defendant asked to have his mother present for questioning, the police replied "no, your mom can't help you now." The three officers also "told [him] that [he] better go along with them or *** they would kick [his] ass." The officers then left the room and returned with Kinnerk. Defendant did not recall whether Kinnerk informed him that he had the right to remain silent and that any statement could be used against him in court, and he denied that Kinnerk told him he had the right to an attorney and that, if necessary, one would be appointed.

Defendant also stated that Kinnerk never met with him alone and that a police officer struck him in the mouth after he gave the statement. Defendant had asked to see his mother, but he had not been permitted to do so until the 7 p.m. interrogation. He first saw the youth officer at the same time. During the 7 p.m. interrogation, he answered Kinnerk's questions of his own free will "on certain occasions" but not always; he also said that the statement was "all false" and that the police told him half of it. He conceded that he had said he had not been threatened, but he testified that he had done so because he did not want to be beaten by the police.

The circuit court denied the motion to suppress. The court found "noteworthy" that defendant's mother and girl friend had been brought to Area 1 rather than left downstairs in the police station. It also held that there was "no question" that defendant had been advised of his rights during the 1:30 p.m. interrogation, specifically stating that it "believe[d] and accept[ed]" Kinnerk's testimony, nor was there any question that defendant had seen his mother prior to the 7 p.m. interrogation or that the youth officer and defendant's mother were present for that questioning. The court commented that the length and intensity of the questioning was "nothing close" to that in cases in which a confession had been held to be involuntary, and that defendant "seem[ed] to be of intelligence above his years in view of his appearance here in this courtroom." The court concluded that "considering the totality of the evidence, this statement was freely and voluntarily given."

At trial, defendant filed a motion *in limine* to delete from his statement mention that the other two young men planned to use the burglary proceeds to purchase sports attire and to buy drugs for later sale. Defendant argued that the statements of his co-offenders were not probative of his own guilt or innocence and that the mention of drugs and the "shallow light" cast by the other purchases would have a highly prejudicial effect. He also argued orally that the co-offenders' statements were inadmissible as double hearsay, conceding that his own side of the conversation was admissible as an admission. The court commented:

> "I respectfully have a problem with starting to redact somebody's statement ***. I don't think we should get into the habit of starting to redact statements. Then it's not his statement and I think the Jury has a right to hear the entire statement in light of the fact that we have ruled that the statement is admissible."

The court then denied the motion, but it said it was willing to reconsider it, commenting "I just do not think that the prejudice if any would be that extreme ***."

At trial, Charles Walker testified that he and Ms. Larkin, his next-door neighbor, had been talking on her front porch from about 12:15 p.m. to about 1 p.m. in the early afternoon of October 4, 1988. Ms. Larkin then unlocked her door and went inside, and Walker went home. Just a few minutes later, while in his garden, Walker saw the two young men, both of whom he recognized, climbing out a side window of Ms. Larkin's home. He knocked on the door of the basement apartment in Ms. Larkin's building and asked the tenant, Sandra Garth, to call the police from his apartment. After trying Ms. Larkin's door and finding it locked, Walker kept watch by Ms. Larkin's window until the police arrived. He had not seen defendant, nor anyone other than the two young men he recognized, come out the window.

Ms. Garth testified that after calling the police, she looked for Ms. Larkin at the latter's other building up the block. When she was on her way back to Ms. Larkin's home, she saw defendant at the end of the alley.

The State also introduced defendant's statement to the court reporter. In it, he said he and the two young men, one of whom was his cousin, had made plans earlier to rob Ms. Larkin. The other two entered Ms. Larkin's house through a side window, which he had found unlocked, and then let defendant in the front door. When Ms. Larkin entered and walked down the hallway, one of the other boys wielded a crowbar "like a baseball bat" and hit Ms. Larkin in the back of the head. The other two then went back to look for money in the bedroom, and defendant remained in the hallway. When Ms. Larkin began to rise, defendant told the other two. The one young man returned and hit her again with the crowbar; she was moaning. Defendant then left by the front door and went around to the alley, where he saw Ms. Garth.

The trial testimony of the witnesses who had testified at the suppression hearing was substantially similar to their earlier testimony. Additional evidence included defendant's fingerprints found on the outside of the window at the victim's house; a bloody crowbar found outside under the side window; and testimony by the medical examiner, who stated that Ms. Larkin's injuries were caused by at least six or seven blows by a blunt instrument, that Ms. Larkin's ankles bore bruises consistent with being bound, and that something recovered from the back of Ms. Larkin's mouth also contributed to her death.

At the close of the trial, defendant moved for a directed verdict, but the court denied the motion. After receiving an instruction on accountability, the jury returned general verdicts of guilty on the charges of residential burglary and first degree murder. Defendant moved for a new trial for, among other reasons, the denials of the motion to sup-

press and the motion *in limine* and prosecutorial misconduct, but the court denied this motion too.

At the sentencing hearing, the State asked for a sentence of natural life for "a murder that was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty." It conceded, however, that who and how many of the three young men had inflicted the blows was unknown; it also suggested an extended term of 100 years. Defense counsel objected to both options, claiming that neither could be imposed on a minor. She then stressed that defendant had been only 16 at the time of the murder, that he had no significant criminal background,[1] had been in school until his arrest and continued his studies while awaiting trial, had had summer employment, and showed remorse. Defendant himself also addressed the court. He acknowledged that he had been "young and foolish ignoring [his] parent's guidance and advice and doing [his] own thing" and "running around the wrong types of people."

The circuit court reviewed the factors it considered in aggravation and mitigation, described more fully below in Part IV. It then sentenced defendant to concurrent terms of 45 years for the murder and 15 years for the residential burglary.

## I

Defendant first contends that the court should have found that the statement to the court reporter was involuntary and granted the motion to suppress it because (1) defendant was given no food or drink for the six hours he was in custody before his statement to the court reporter; (2) the police refused to allow defendant's mother to speak with him, despite her requests to do so; and (3) the arresting officers did not promptly contact a juvenile officer, in violation of the Juvenile Court Act of 1987 (Pub. Act 85—601, eff. Jan. 1, 1988, now codified at Ill. Rev. Stat. 1991, ch. 37, par. 801—1 *et seq.*). An inculpatory statement must be voluntary to be admissible, he observes, and given the above facts, his statement was involuntary and thus the circuit court's denial of his motion was improper.

Defendant begins by pointing out that he was only 16 at the time of his arrest, with only a 10th-grade education and little familiarity with the criminal justice system. He also was kept in a locked room for the six hours prior to his statement to the court reporter and given nothing to eat or drink. In addition, although he recognizes that

---

[1]According to the presentence investigation report, defendant's sole prior conviction was for "riding in a stolen vehicle," for which he received probation.

a juvenile has no *per se* right to consult with an adult, he urges this court to hold that mere physical proximity is not enough, in contrast with the circuit court's emphasis on the fact that defendant's mother was permitted to remain physically near her son. Moreover, defendant contends that the police testimony that his mother was present for the earlier interrogations is unbelievable. Not only is it in direct conflict with testimony by his mother, his girl friend, and himself that she was not given any opportunity to speak to defendant until the 7 p.m. interrogation, but Sergeant Swistowicz's police report is devoid of any mention of her presence, unlike the report for one of the other co-offenders, which states that family members were present during questioning. He argues that it defies common sense to conclude that his mother perjured herself on this point when she was truthful about other facts in spite of the obvious prejudice to her son. Lastly, he stresses that no juvenile officer was notified prior to or present for the questioning that occurred before the 7 p.m. interrogation, a circumstance condemned by other courts. The passage of over five hours' time before notification of the youth officer was particularly egregious, he continues, because the youth officer's office was just down the hall from where defendant was being held and, in addition, he arrived at Area 1 at midday, when a youth officer likely was readily available. Although he acknowledges that this improper police conduct alone will not warrant a finding of involuntariness, he warns that to absolve the police for this statutory violation would render the statute meaningless.

The Illinois Supreme Court recently had occasion to address the propriety of denial of a motion to suppress on the ground of involuntariness. In *People v. Melock* (1992), 149 Ill. 2d 423, the court first commented on the limited scope of review of a circuit court's ruling on a motion to suppress, stating that "[a]bsent a determination that the trial court's finding was manifestly erroneous, we will not disturb it. [Citation.] Further, *** it is the function of the trial court to determine the credibility of the witnesses and to resolve any conflict in their testimony. [Citation.]" (*Melock*, 149 Ill. 2d at 432.) With regard to suppression motions based on alleged coercion, the court then stated that

> "[i]t is a fundamental principle of criminal procedure that a confession must be voluntary; otherwise, it is inadmissible. [Citations.] 'The test of voluntariness is whether the statement was made freely, voluntarily and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he confessed.' [Citations.] A determination of

voluntariness requires consideration of the totality of the circumstances. [Citations.] Factors to be considered in making the determination include the age, education and intelligence of the accused, the duration of the questioning, and whether he received his constitutional rights or was subjected to any physical punishment. [Citations.] No single fact is dispositive; the question must be answered on the facts of each case. [Citations.]

The established standard of review of a trial court's finding on a question of the voluntariness of a confession is whether the finding is contrary to the manifest weight of the evidence." *Melock*, 149 Ill. 2d at 447-48.

See also *In re D.C.* (1st Dist. July 17, 1992), No. 1—90—0981, slip op. at 9-10.

Courts scrutinize custodial statements by juvenile suspects with particular care, given that the potential for coercion is enhanced. (*People v. Cole* (1987), 168 Ill. App. 3d 172, 179, 522 N.E.2d 635, 639, *appeal denied* (1988), 122 Ill. 2d 582, 530 N.E.2d 253.) In such cases, a court must take "utmost care *** to insure that the confession is voluntary and not coerced, suggested or the result of the juvenile's ignorance of his rights or his adolescent fantasy, fright or despair." (*In re J.S.* (1984), 121 Ill. App. 3d 927, 936, 460 N.E.2d 412, 418.) To this end, additional factors come into play, including time of day and the presence of a parent or other adult interested in the juvenile's welfare. (*People v. McGhee* (1987), 154 Ill. App. 3d 232, 507 N.E.2d 33, *appeal denied* (1987), 116 Ill. 2d 570, 515 N.E.2d 120.) Because a juvenile is "an easy victim of the law," his self-incriminating statement will be deemed inadmissible if an examination of the facts reveals that it was "a confession wrung from a child by means which the law should not sanction." *Haley v. Ohio* (1948), 332 U.S. 596, 599, 601, 92 L. Ed. 224, 228-29, 68 S. Ct. 302, 304 (opinion of Douglas, J., joined by Black, Murphy, and Rutledge, JJ.).

■ Applying the above factors to the evidence adduced at the suppression hearing in this case, and giving due deference to the circuit court's resolution of factual questions in light of its ability to observe firsthand the witnesses' credibility and demeanor, we hold that there is sufficient evidence to support the circuit court's determination that under the totality of the circumstances here, the statement was voluntary. Although it is true that defendant was only 16 years old and in the 10th grade at the time of the incident, the circuit court expressly described him as someone who "seem[ed] to be of intelligence above his years in view of his appearance here in this courtroom." In addition, the 1:30 p.m. and 3:30 p.m. interrogations together took, at most, only 75 min-

utes of the six midday hours defendant was in custody prior to the 7 p.m. questioning, unlike cases in which a confession was deemed involuntary because an accused was subjected to relay teams of interrogators from dusk to dawn. Too, although no one disputes that defendant was given nothing to eat or drink while he was at Area 1, so too no one suggests that he asked for anything.

The most compelling aspect of defendant's argument is that the statement should be suppressed because he was not given *Miranda* warnings prior to the first two interrogations and was denied access to his mother for the six hours between their arrival at Area 1 and the 7 p.m. interrogation. If these allegations were true, this case would be factually almost identical to *People v. Brown* (1989), 182 Ill. App. 3d 1046, 538 N.E.2d 909, in which the court sustained the circuit court's decision to suppress the defendant's statement because, in combination, the lack of *Miranda* warnings and the absence of a parent despite repeated requests provided sufficient support for the circuit court's ruling. Here, defendant testified that he did not receive *Miranda* warnings at the two earlier interrogations, and he, his mother, and his girl friend all testified that he was not permitted to confer with his mother until just prior to the 7 p.m. interrogation, but according to the police officers and Kinnerk, defendant was given *Miranda* warnings prior to each interrogation and his mother was present each time. The conflicting testimony thus placed the question "in equilibrium" (*Brown*, 182 Ill. App. 3d at 1052, 538 N.E.2d at 912-13), and the circuit court chose to believe the State's witnesses. Because a reviewing court may not overturn the circuit court's credibility determinations unless they are so lacking in evidentiary support that they are manifestly erroneous, we cannot do so here.

Moreover, unlike cases in which a juvenile suspect was picked up without his parent's knowledge of the crime or the arrest, defendant was with his mother for the five or six hours prior to his arrest and they both were aware that the police wanted to talk with him about his role in the events of the day before. Therefore, defendant and his mother had ample opportunity to confer prior to the 1:30 p.m. interrogation. Furthermore, even if police do not fulfill their dual affirmative duties of informing those questioning a juvenile of a parent's request to see her child and of halting the questioning upon request to allow a juvenile and parent to confer (*Brown*, 182 Ill. App. 3d at 1053-54, 538 N.E.2d at 913), this is not dispositive of the question of voluntariness; instead, it is only one of many factors to be taken into account.

As for the statutory violation, section 5—6 of the Juvenile Court Act of 1987 (Pub. Act 85—601, art. V, §5—6, eff. Jan. 1, 1988,

now codified at Ill. Rev. Stat. 1991, ch. 37, par. 805—6) applies when police arrest someone under 17 years of age without a warrant but with reasonable cause to believe the minor has violated State law.[2] It provides that

> "[a] law enforcement officer who takes a minor into custody without a warrant *** shall, if the minor is not released, *** without unnecessary delay take the minor to the nearest juvenile police officer designated for such purposes in the county of venue or shall surrender the minor to a juvenile police officer in the city or village where the offense is alleged to have been committed." Ill. Rev. Stat. 1991, ch. 37, par. 805—6(2).

In his argument, defendant relies on cases in which this provision's precursor was violated and a confession was found inadmissible. In each of these cases, however, the court's decision was predicated on evidence of additional factors as well, most often an illegal arrest: *People v. McGhee* (1987), 154 Ill. App. 3d 232, 507 N.E.2d 33 (no probable cause for arrest); *People v. Cole* (1988), 168 Ill. App. 3d 172, 522 N.E.2d 635 (same, plus no attempt to notify parent); and *People v. Travis* (1984), 122 Ill. App. 3d 671, 462 N.E.2d 654 (same as *Cole*, with two illegal detentions and no written statement). These other decisions are consonant with the rule that because voluntariness is determined by the totality of the circumstances, a delay in presenting a juvenile suspect to a youth officer will not by itself render a statement involuntary, especially when, as here, the youth officer is notified and the defendant is given *Miranda* warnings prior to making the statement. (*In re J.S.* (1984), 121 Ill. App. 3d 927, 460 N.E.2d 412.) Instead, a delay in notifying a youth officer is only one factor in determining whether a confession is involuntary (*People v. Creach* (1979), 69 Ill. App. 3d 874, 889-90, 387 N.E.2d 762, 774, *aff'd in part & rev'd in part on other grounds* (1980), 79 Ill. 2d 96, 402 N.E.2d 228, *cert. denied* (1980), 449 U.S. 1010, 66 L. Ed. 2d 467, 101 S. Ct. 564), and here, it is the only one that exists in defendant's favor. Thus, even though it is undisputed that no youth officer was summoned until 6:30 p.m., when defendant had been at Area 1 for over five hours and interrogated briefly, this violation of the Act alone will

---

[2]Although defendant claims that the delay violated section 3—8 of the Juvenile Court Act of 1987 (Ill. Rev. Stat. 1991, ch. 37, par. 803—8), that provision applies to minors taken into custody for authoritative intervention or other reasons not implicated here. The wording of section 3—8 is substantially similar to that of section 5—6, and both have the same precursor, section 3—2 of the Juvenile Court Act (Ill. Rev. Stat. 1985, ch. 37, par. 703—2).

not warrant suppression of the statement. We agree with defendant that the statutory guarantee becomes hollow without a method of enforcement, but the legislature has provided no sanctions for noncompliance, other than its tacit agreement that a violation is one of the factors to consider when determining whether such statements are voluntary.

■ In sum, our review of each of the factors that courts consider when determining whether a juvenile's statement is voluntary compels us to conclude that the circuit court's decision that the statement was voluntary is well supported by the record and thus may not be reversed.

## II

Defendant acknowledges that a prosecutor has wide latitude in argument, but he emphasizes this does not permit the State to attempt to inflame a jury's passion nor arouse its prejudice. Such comments warrant reversal because they deny a defendant a fair trial and here, he argues, the prosecutor misstated and distorted the function of the jury by commenting at the end of his rebuttal argument, "[Defense counsel] stated to you [the jury] that on October 4, 1988, [the victim] was alone, elderly, and helpless. And she met her death alone. Ladies and gentlemen, in this courtroom she is no longer alone. She has you." The defendant objected, and the court sustained the objection, but defendant argues that the error was not cured because the court did not instruct the jurors to disregard the remark. Even though the objection was sustained, he continues, the prosecutor persisted in this improper comment, next saying, "[the victim] has a common sense jury." The prosecutor also stated at closing "[a]nd this incident took a whole lot more from [the victim] than it could possibly take from [defendant]." The court sustained the objection to this remark as well, but defendant argues that the comment was intended to arouse the jury's passions and was identical to an earlier one that the prosecutor had been warned not to pursue. Defendant characterizes as ludicrous the State's contention that the prosecutor merely rebutted his own counsel's argument or had been invited to commit misconduct by his counsel's own remarks. As for the "alone and lonely" comment, defense counsel was stating facts, not arguing, he reasons, so there was no argument to rebut; with regard to inviting the "took a whole lot more" remark, the State's comments were not merely rebuttal of argument; instead, they were impermissible repetition of previously barred matter.

■ We agree that any error could not be cured merely by the circuit court's having sustained the objections because the court did not admonish the jury to disregard the comments after sustaining the objections. (*People v. Tyson* (1985), 137 Ill. App. 3d 912, 921, 485 N.E.2d 523, 530.) Nevertheless, as the Illinois Supreme Court recently observed, "[a]n improper comment during closing argument may constitute reversible error where it is shown that had the comment not been made, the verdict would have been different." (*People v. Leger* (1992), 149 Ill. 2d 355, 399.) In our view, these comments do not warrant reversal because we find it highly unlikely that, absent the comments, the verdict would have been different. Here, the jury heard defendant's custodial statement, in which he described how he and the other two young men planned and committed the burglary; it knew that his fingerprints had been found at the scene; and it heard Ms. Garth's testimony that she saw him at the end of the alley just after the crimes had been committed. In light of the quantum of direct evidence of defendant's complicity in the crimes, the error here, if any, is not reversible.

### III

Defendant insists that the statements of his co-offenders concerning their plans for their share of the proceeds of the burglary should have been redacted because they were hearsay, irrelevant, and even if relevant, extremely prejudicial to him. The statements were irrelevant, he claims, because they had no bearing on his own guilt or innocence and the court compounded its error by giving the jury no limiting instruction as to the purpose for which such statements could be offered. Defendant describes the State's argument that the others' statements are relevant to defendant's motive for participation as "feeble" and "outlandish," particularly given that defendant's presentence investigation report shows that his last, and only, drug use was marijuana three years prior to the crime. "Prejudice is prejudice," defendant argues, so even if relevant, the statements must have been prejudicial enough to warrant redaction. Too, defendant asserts, the statements were made by out-of-court declarants and, as such, were inadmissible as hearsay because even though the plans were made in defendant's presence, there is no evidence that he adopted them.

■ Addressing the last argument first, we note that although the remarks were made by out-of-court declarants, they were not being offered for the truth contained therein. As such, they were not hearsay, which by definition is an out-of-court statement offered in court for the truth of the matter asserted. (*Hengels v. Gilski* (1984), 127 Ill.

App. 3d 894, 912, 469 N.E.2d 708, 723.) Accordingly, the admission of these remarks did not violate the rule against hearsay.

■■ The threshold for admissibility on relevance grounds is whether the evidence "tends to establish a fact in controversy or to render a proposition in issue more or less probable"; a circuit court's determination as to relevance will be reversed only if it represents an obvious abuse of discretion. (*Betts v. Manville Personal Injury Settlement Trust* (1992), 225 Ill. App. 3d 882, 922, 588 N.E.2d 1193, 1219 (abuse of discretion to admit evidence of established facts because irrelevant to controverted issues).) Here, as defense counsel stated at the hearing on the motion, at issue was the extent of defendant's involvement in the crimes. Given that the State's theory was accountability, evidence concerning defendant's recounting of conversations among the three young men when planning the burglary, including defendant's awareness of and thus tacit agreement with his co-conspirators' plans for the proceeds, made it more probably true than not that defendant shared their motive and that he intentionally and knowingly acted in concert with the others in the planning and execution of the burglary. As such, the challenged portions of the statement were relevant. Regarding defendant's argument concerning the lack of a limiting instruction, we note that defendant made no request for one.

Even if relevant, however, evidence will be excluded if the prejudicial effect outweighs its probative value; a circuit court's ruling on this question, as with relevance, will not be reversed absent an abuse of discretion. (*People v. Brown* (1991), 214 Ill. App. 3d 836, 844-45, 574 N.E.2d 190, 195, *appeal denied* (1991), 141 Ill. 2d 547, 580 N.E.2d 121 (circuit court properly admitted evidence of prior sexual assaults because probative value as to defendant's *modus operandi* outweighed prejudicial effect).) Here, as explained above, the evidence at issue was highly probative of the extent of defendant's involvement in the planning and commission of the burglary; in contrast, the prejudicial effect was slight because the challenged portions of defendant's statement concerned only three questions and answers from a 15-minute interrogation and, in comparison with the evidence of the brutality with which Ms. Larkin was beaten, this fleeting reference to the others' plans to buy and then sell unspecified drugs would not likely have distracted the jury from the question of defendant's guilt or innocence of the crimes for which he was on trial. Thus, on balance, under the circumstances here, the potential prejudicial effect on defendant was far outweighed by the probative value of the comments, so the circuit court did not abuse its discretion in refusing to redact them.

## IV

Defendant acknowledges that a circuit court's sentencing decisions are entitled to deference, but he argues that the 45-year sentence here, though less than the maximum allowed, conflicts severely with the purpose and spirit of the law and thus was an abuse of discretion. The Illinois Constitution, he notes, mandates balancing retribution with rehabilitation, and incarcerating a young man for at least 22½ years is inconsistent with this goal. Courts look at a defendant's age, demeanor, education, and criminal history as well as the crime and a defendant's role, he argues, and the sentence here, only 15 years less than the maximum, is "extremely long." He also contends that the court did not take into account his remorse or the lack of evidence that he alone was the killer.

As defendant correctly notes,

"[a] trial court's sentencing decisions are entitled to great deference and weight. [Citation.] A trial judge is in a far better position than an appellate court to fashion an appropriate sentence, because such judge can make a reasoned judgment based upon firsthand consideration of such factors as 'the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age' [citations]; whereas the appellate court has to rely entirely on the record [citation].

Nonetheless, the discretion of a trial court in making sentencing decisions is not totally unbridled. Reviewing courts are empowered under our Rule 615(b)(4) [citation] to reduce sentences. The standard of review is whether a trial court has abused its discretion in imposing a sentence; if it has, the sentence may be altered upon review. [Citations.] When reviewing courts examine the propriety of sentences imposed by trial courts, they should proceed with great caution and care. [Citation.] A reviewing court must not substitute its judgment for that of a sentencing court merely because it would have weighed the factors differently." *People v. Streit* (1991), 142 Ill. 2d 13, 18-19, 566 N.E.2d 1351, 1353.

■ Here, the circuit court began by observing that it would take into account the statutory aggravation and mitigation factors as well as "the competing goals or factors or elements that we might consider[,] those being protection of society, punishment, deterrence, and rehabilitation." It then painstakingly described each factor that affected its determination of defendant's sentence, including both aggravation and mitigation factors, such as the age of the victim, the

lack of provocation, deterrence of others, and the deliberate nature of defendant's conduct along with defendant's age and lack of a history of delinquency. It also indicated its belief that the age of the victim qualified defendant for an extended term under section 5—8—2 of the Unified Code of Corrections (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—2), and it commented that defendant was legally responsible for the conduct of his two companions as well as his own. The court then sentenced defendant to a term of 45 years, and after doing so, it emphasized that it believed that the sentence was "appropriate and just under the circumstances."

Here, the circuit court's thoughtful analysis indicates that, contrary to defendant's argument, it quite carefully attempted to strike a balance between what it called the "competing goals" of sentencing, including deterrence and rehabilitation. From its comments, again contrary to defendant's interpretation, it is apparent that the court also specifically took into account that defendant might not have been directly responsible for the murder here. Further, given that the court could observe defendant's demeanor throughout the trial, as well as his expressions of remorse only moments before it imposed the sentences, defendant's contention that the court did not consider these factors is unreasonable. For these reasons, and because the sentence here is almost precisely in the middle of the statutory range for the crime of first degree murder, we cannot say under the circumstances here that the circuit court failed to take into account defendant's age, remorse, and potential for rehabilitation or that the court abused its discretion.

## V

Defendant contends that because the indictment contained three counts of murder, because the jury returned a general verdict of first degree murder, and because the sentence was 45 years, the circuit court must have based its sentence on three convictions for murder. Because multiple convictions based on the same physical act are improper, he reasons, two counts must be vacated and the case remanded for resentencing, even if the original sentence was appropriate, so long as the sentence is more than the minimum. Defendant contends that the error in the sentencing order is far more significant than the State claims. In *People v. Williams* (1988), 176 Ill. App. 3d 73, 81, 530 N.E.2d 1049, for example, the court vacated two counts of the conviction because the order, like the one here, "indicate[d] that the defendant was sentenced on three counts." He notes that even though the State contends that it is absurd to think that the court's

sentence was based on three convictions, defendant's counselor at Menard Correctional Center considers him to be serving three concurrent murder sentences along with the burglary sentence.

■ It is true that the sentencing order at issue lists all three counts, but unlike the cases cited in support by defendant, the sentencing order followed a single verdict and a single conviction, not multiple convictions for the same act under different theories. From the record before us, we see no possibility whatsoever that the sentence was influenced by more than a single conviction because the circuit court, which had presided at the trial, mentioned only one victim at the sentencing hearing and stated "[w]e sentence you to the Illinois Department of Corrections on *the charge* of first degree murder, forty five years' [*sic*]" (emphasis added), recognizing that only one conviction had been obtained. Nevertheless, we recognize that the wording of the sentencing order, which cites three different subsections of the first degree murder statute, could easily be interpreted by those unfamiliar with the facts of this case as the result of three convictions and that, at some later date, this latent ambiguity could adversely affect defendant. Therefore, we agree that remand for entry of a new sentencing order reflecting the single murder conviction, as well as the residential burglary conviction, is in order here.

### VI

■ Defendant filed a *pro se* brief, contending that his trial counsel did not bring to the circuit court's attention the fact that he had not signed a *Miranda* waiver and that this lapse constituted ineffective assistance of counsel. The record, however, reveals that his attorney elicited testimony about the lack of a written waiver from both Swistowicz and Kinnerk at the suppression hearing, and in her closing argument at the motion, his attorney twice mentioned the lack of a separate signed waiver.

For the reasons stated above, we affirm the circuit court's denial of defendant's motions to suppress the entire custodial statement and to redact portions of it. We also affirm defendant's convictions and sentences, but we vacate the sentencing order and remand for an order reflecting only one murder conviction as well as the residential burglary conviction.

Affirmed in part; vacated in part and remanded.

HARTMAN, P.J., and SCARIANO, J., concur.